A.M., Appellant–Plaintiff,

v.

**ROMAN CATHOLIC CHURCH, Diocese, and Monsignor A.S.,[1] Appellees– Defendants.**

No. 79A02–9601–CV–3 [2].

Court of Appeals of Indiana.

Aug. 9, 1996.

---

1. Due to the sensitive nature of the case, we have, on our own motion, not disclosed the identities of the parties involved. *See R.E.G. v. L.M.G.,* 571 N.E.2d 298 (Ind.Ct.App.1991).

2. This decision represents the three thousandth majority opinion authored by Judge Robertson.

Jon D. Krahulik, Robert G. Weddle, Yosha Ladendorf Krahulik & Weddle, Indianapolis, for Appellant–Plaintiff.

Daniel J. Harrigan, Bayliff, Harrigan, Cord & Maugans, Kokomo, Thomas B. Parent, John C. Duffey, Stuart & Branigin, Lafayette, for Appellees–Defendants.

## OPINION

ROBERTSON, Judge.

Thirty years ago, A. M., then age six or seven, was sexually molested by her Roman Catholic priest [Priest]. A.M.'s mother [Mother] soon learned of the molestations and contacted the Priest as well as the Bishop who supervised the Priest. The Bishop convinced Mother that it would be best for everyone to sweep the matter under the rug. Mother took the advice and never discussed the matter with A.M. Mother and A.M. had both repudiated the Catholic faith by 1977, while A.M. was still a minor.

A.M. had repressed the memory of the molestations until 1994. In 1995, she brought the present lawsuit against the Priest and the particular parish and diocese involved [all of which will be referred to collectively as the Church]. The trial court entered summary judgment in favor of the Church finding that A.M.'s lawsuit was time-barred. This appeal ensued.

A.M. asserts that the influence the Church exercised over her Mother to secure her silence invoked the operation of the doctrine of fraudulent concealment and tolled the statute of limitations until 1994, when A.M. discovered her cause of action. We disagree and affirm summary judgment in favor of the Church.

## FACTS

The facts in the light most favorable to the nonmovant A.M. reveal that she was born in 1960. Her family was Roman Catholic, and she attended a Catholic school. In 1966 or 1967, she was sexually molested on a repeated basis at school by a Priest, Monsignor A.S. Soon afterwards, A.M. reported the molestations to her older sister, who in turn reported them to Mother. Mother called the Priest, who then visited Mother's home and apologized. Additionally, Mother contacted Bishop R.J.G. (now deceased) who also visited the home and apologized to Mother. The Bishop assured Mother that the Church was going to send the Priest away for the help he needed and that the Bishop would take care of the matter. The Bishop repeatedly advised Mother not to talk about the incidents but instead to "keep it quiet." The Bishop stated that it would not be good for Mother, A.M., or him, to discuss the molestations with anyone. The Bishop followed up the visit with a letter, in which he stated:

I wish to thank you for your kindness and understanding, and I wanted to tell you that we are keeping faith with you. Please say a prayer for both [the Priest] and me.

I would suggest that you might destroy this letter after you read it. In this way, we will be protecting both [A.M.] and Monsignor. Thank you.

Mother followed the Bishop's instructions and never again spoke to A.M. about the molestations. The older sister also kept the secret. Mother had decided to take no further action, that it was "better to let sleeping dogs lie," and was determined to get on with life.

The Priest was sent to the St. Joseph Mother House for two and one-half weeks to reflect and meditate about what had occurred. He also received psychiatric therapy on a weekly basis for two and one-half months. The Priest was then reassigned to a different parish. He has continued to visit the Mother House once or twice a year to take a break from parish pressures. The Church has never offered treatment to A.M.

By 1977, both Mother and A.M. had rejected the teachings of, and had severed their relationships with, the Roman Catholic Church, both having joined a Pentecostal church. Mother rejected the Catholic faith based on her belief that it involves the worship of idols. A.M. admitted that she and her Mother had long ago ceased "answer[ing] to the Catholic Church." A.M. reached the age of majority in 1978.

A.M. had repressed all memory of the molestations until 1994, when the memory was triggered by her observation of a little boy with red marks all over his back. Once the memories had surfaced, A.M. experienced stress-related asthma attacks which forced her to resign from her job. A.M. sought treatment and has been diagnosed as suffering from posttraumatic stress syndrome and depression attributable to the molestations by the Priest.

A.M. filed the present lawsuit in 1995. The Priest has admitted that he engaged in sexual improprieties with A.M. during the relevant period. Nevertheless, the Church has asserted that it may not be held legally responsible for A.M.'s injuries because the statute of limitations has expired. The Church obtained summary judgment on this basis, and this appeal ensued. Both the Priest and the Church have submitted Appellee briefs.[3]

## DECISION

Summary judgment is appropriate only if no genuine issues of material fact exist and the moving party is entitled to judgment as a matter of law. Ind.Trial Rule

---

**3.** The Church asserts that we should dismiss this appeal for lack of jurisdiction arguing that the record of proceedings was untimely filed. The Church concedes that A.M. filed a verified petition for an extension of time the day before the ninety day time period prescribed by Ind.Appellate Rule 3(B) expired but nevertheless asserts that this petition failed to satisfy the requirement of App.R. 14(A), that petitions for extensions of time be filed at least five days before the expiration of the time to be extended unless it is made to appear by affidavit that the facts which are the basis of the petition did not exist or were not then known to the applicant or his counsel. We granted A.M.'s request for an extension of time within which to file the record based on the affidavit of her counsel and need not revisit this matter.

56(C); *Great Lakes Chemical Corp. v. International Surplus Lines Insurance Co.,* 638 N.E.2d 847, 849 (Ind.Ct.App.1994). In reviewing a motion for summary judgment, this court must determine whether there is a genuine issue of material fact and whether the law has been correctly applied by the trial court. *Cloverleaf Apartments, Inc. v. Town of Eaton,* 641 N.E.2d 665, 667 (Ind.Ct.App.1994). Neither the trial court, nor the reviewing court, may look beyond the evidence specifically designated to the trial court. *Seufert v. RWB Medical Income Properties I Limited Partnership,* 649 N.E.2d 1070, 1072 (Ind.Ct.App.1995). A trial court's grant of summary judgment is "clothed with a presumption of validity," and the appellant bears the burden of demonstrating that the trial court erred. *Rosi v. Business Furniture Corp.,* 615 N.E.2d 431, 434 (Ind.1993).

 Statutes of limitation are favored because they afford security against stale claims and promote the peace and welfare of society. *Shideler v. Dwyer,* 275 Ind. 270, 417 N.E.2d 281, 283 (1981). They are enacted upon the presumption that one having a well-founded claim will not delay in enforcing it. *Id.* The defense of a statute of limitation is peculiarly suitable as a basis for summary judgment. *Id.* at 273, 417 N.E.2d 281.

 Ordinarily, a plaintiff's claim for injuries suffered during her childhood will expire two years after she has reached the age of majority. Ind.Code 34–1–2–5; *Fager v. Hundt,* 610 N.E.2d 246, 250 (Ind.1993). However, such opportunity is of no avail to a person who lacks knowledge, or cannot remember, her early childhood trauma and injury. *Id.* Nevertheless, because of the natural and legal obligations of parents to protect and care for their children, discovery of a cause of action by a child's parent, even absent actual cognition or memory by the child, shall be imputed to the child and shall constitute the accrual of an action and re-

quire the plaintiff to file her action within two years of reaching the age of majority. *Id.* at 251. This general rule is subject to an exception when the plaintiff's claim asserts a childhood injury from the intentional felonious act of a parent. *Id.* Under that circumstance, the doctrine of fraudulent concealment will be available to estop a defendant from asserting the statute of limitations defense. *Id.* Under this exception, a plaintiff must exercise due diligence in commencing her action after the equitable grounds cease to operate as a valid basis for causing delay. *Id.*

In the present case, A.M.'s Mother knew about the molestations. A.M. concedes that, if the fraudulent concealment exception discussed in *Fager* is limited to the "intentional felonious act of a parent," her cause of action would be time-barred. (A.M.'s brief, p. 8). Nevertheless, A.M. argues that the fraudulent concealment exception in *Fager* is not limited to actions brought against parents but also applies under the present circumstances where the tortfeasor abused a confidential relationship in order to enlist the parent's cooperation in the concealment of the cause of action.[4] In support of this argument, A.M. relies on I.C. 34–1–14–5(4), the priest-parishioner evidentiary privilege, for the proposition that the Church and her Mother stood in a confidential, fiduciary relationship. In her brief, A.M. states:

> The defendants in this case are not parents or grandparents or a boyfriend, but instead constitute the 'mother church', perceptively but one step removed from God Himself. The esteem and reverence in which parishioners, such as [Mother], hold the church give it a special power to persuade and convince. Here church officials used this imposing power as well as their superior positions as 'men of God' to convince [Mother] to keep quiet about the molestation and not discuss the facts with [A.M.]. A jury could deduce from the evidence in this case that the defendants

---

4. In *Doe v. Roe No. 1,* 52 F.3d 151 (7th Cir.(Ind.) 1995), the Court rejected plaintiff's argument that the *Fager* exception extended beyond the scenario where a parent is the felonious actor to situations where a parent is part of the 'dynamics' which permit the abuse to occur or who

colludes with the actual perpetrator (plaintiff's brother) by concealing the facts of the abuse from the child victim. *Id.* at 153. A.M. notes correctly that we are not bound by this decision. (A.M.'s reply brief, p. 3).

thereby fraudulently concealed from A.M. her molestation by [Priest] by abusing the trust and respect they held as trusted, God-ordained officials. They acted in their own interest, without regard for [A.M.'s] best interest in convincing [Mother] to 'keep quiet.' They should be estopped from reaping the ill-begotten harvest of what they had sowed.

(A.M.'s brief, p. 12).

We question but need not decide whether A.M.'s expansive reading of *Fager* is appropriate. Even if the statute of limitations were tolled by the influence of the Church, A.M.'s cause of action would be time-barred. An equitable estoppel under the doctrine of fraudulent concealment can arise either from an active effort to conceal a cause of action or from the violation of a fiduciary or confidential relationship, described as a constructive fraud. *Spoljaric v. Pangan,* 466 N.E.2d 37, 40 (Ind.Ct.App.1984); *Yarnell v. Hurley,* 572 N.E.2d 1312, 1314 (Ind.Ct.App.1991), *trans. denied.* In the present case, A.M. does not assert (and could not reasonably assert) that the Church actively concealed her cause of action from her Mother. The undisputed, designated evidence reveals that the Church had admitted the Priest's wrongdoing to Mother. Thus, A.M.'s claim for an estoppel under the doctrine of fraudulent concealment is based on the abuse of the confidential relationship (constructive fraud) between the Church (represented by the Bishop and the Priest) and Mother.

 As noted above, estoppel under the doctrine of fraudulent concealment will be denied if the plaintiff fails to exercise due diligence in filing an action after the equitable grounds cease to be operational as a valid basis for inducing plaintiff's delay. *Fager,*

610 N.E.2d at 251; *Spoljaric,* 466 N.E.2d at 45. Accordingly, where the fraudulent concealment is based upon a violation of a fiduciary relationship, the constructive fraud terminates at the conclusion of the fiduciary relationship at which time the statute of limitations begins to run. *Spoljaric,* 466 N.E.2d at 40; *Yarnell,* 572 N.E.2d at 1314.

In the present case, Mother had terminated her relationship with the Church by 1977, during A.M.'s minority. At that point, any constructive fraud which had induced Mother's silence would have ceased to be operational and Mother's knowledge of A.M.'s cause of action would have become imputed to A.M. requiring her to bring her cause of action within two years of reaching the age of majority. *See Fager,* 610 N.E.2d at 251.[5]

In 1978, A.M. turned eighteen. Thus, the statute of limitations ran in 1980. Accordingly, A.M.'s lawsuit was filed over a decade too late. *See Ernstes v. Warner,* 860 F.Supp. 1338, 1340 (S.D.Ind.1994). As A.M. has failed to meet her burden of demonstrating that the trial court erred in entering summary judgment, we affirm.

Judgment affirmed.

NAJAM and BAKER, JJ., concur.

---

5. In her brief, A.M. responds to this argument as follows:

[The Priest] also argues that even if [the Bishop] exercised undue influence over [Mother] such as to constitute fraudulent concealment, such fraudulent concealment could not continue after the [family] severed their ties with the Catholic Church and joined the Pentecostal faith. Seemingly, [Priest] argues *factually* that [the Bishop's] influence could not continue after [Mother] was no longer a parishioner. Surely, it is for a jury to determine from the facts of this case whether or not the

influence exerted by [the Bishop] on [Mother] as a 'man of God' continued to dominate [Mother's] psyche concerning whether or not to keep such molestations from [A.M.] even after she changed churches.

(A.M.'s reply brief, p. 5; emphasis original). We summarily reject this argument. This lawsuit for damages was filed against a Roman Catholic priest, a Roman Catholic church, and a Roman Catholic Diocese, not the church universal. The constructive fraud, if any, terminated upon Mother's repudiation of the Catholic faith.