Frank **MARTINELLI,** Plaintiff,

v.

**BRIDGEPORT ROMAN CATHOLIC DIOCESAN CORPORATION and Laurence Brett, Defendants.**

**No. CIV. 3:93CV1482 JBA.**

United States District Court,
D. Connecticut.

March 24, 1997.

William M. Laviano, Donna L. Ruhling-Laviano, Jennifer D. Laviano, Laviano Law Offices, Ridgefield, CT, for plaintiff.

Joseph T. Sweeney, Halloran & Sage, Hartford, CT, Robert C. Danaher, Sr., Matthew G. Conway, Danaher, Tedford, Lagnese & Neal, Hartford, CT, for defendant.

Joseph Dimyan, Pinney, Payne, Van Lenten, P.C., Danbury CT, for movant.

### Ruling on Defendant's Motion for Summary Judgment
### *(Doc. 42)*

ARTERTON, District Judge.

Plaintiff, a resident of Wisconsin, brings this lawsuit to recover for damages allegedly sustained as a result of three sexual encounters between himself and defendant Father Laurence Brett while Father Brett was employed as a priest by defendant Bridgeport Roman Catholic Diocese Corporation (the "Diocese"). The timing of these alleged sexual encounters is not entirely clear, but the complaint and plaintiff's deposition indicate that they occurred during the time period between 1961 and 1963, when plaintiff was between 13 and 15 years of age. Plaintiff claims that his memory of these events was suppressed and only recovered through the assistance of psychotherapy in 1991.

Plaintiff brings several counts against Father Brett and the Bridgeport Diocese: 1) intentional infliction of emotional distress by both defendants; 2) assault and battery against Father Brett only; 3) breach of fiduciary duty by both defendants for failure to disclose the sexual abuse; 4) negligent infliction of emotional distress by both defendants; 5) negligent retention of Father Brett by the Bridgeport Diocese; 6) vicarious liability of the Bridgeport Diocese for Father Brett's misconduct; and 7) negligent training and supervision by the Bridgeport Diocese.

On August 2, 1993, a summons was returned executed on Father Brett, who apparently is (or was) a resident of Maryland[1] and is no longer formally affiliated with the Bridgeport Diocese.[2] The docket does not indicate that either an appearance or an answer to the complaint have ever been filed on his behalf. No pending motions pertain to Father Brett in his capacity as a party in this case.

Defendant Bridgeport Diocese moves for summary judgment on the following grounds: 1) the doctrine of respondeat superior cannot be invoked in this case as a matter of law; 2) the Diocese had no antecedent notice of Father Brett's proclivity towards sexual abuse of children; and 3) plaintiff's claims are barred by the applicable statute of limitations. For the following reasons, defendant's motion is GRANTED in part and DENIED in part.

### Background

Following seminary training in Maryland, Father Brett began his career as a priest at Saint Cecilia Church in Stamford, Connecticut, where plaintiff was a parishioner, in June of 1962. During Father Brett's tenure at Saint Cecilia, which lasted a little over two years, the young priest allegedly struck up

---

1. Plaintiff claims that he is unable to determine the present whereabouts of Father Brett.

2. Plaintiff contends, however, that Father Brett has had ongoing communications with the Diocese since the initiation of this lawsuit. The Diocese denies this allegation.

relationships with a small group of adolescent boys who were interested in liturgical reforms in the Roman Catholic Church. Father Brett called this informal group of high school friends "Brett's Mavericks." According to plaintiff, who was a member of the group, Father Brett not only acted as a mentor and spiritual advisor to "Brett's Mavericks," but also abused his position of authority and trust by inducing plaintiff and other members of the group to engage in sexual relations with him. Plaintiff claims to be able to recall three specific incidents in which he was involved, which are detailed in his complaint and deposition.

In September of 1964, Father Brett left Saint Cecilia in order to pursue new responsibilities as a spiritual director at Sacred Heart University in Bridgeport and as a member of a diocesan commission on sacred music and the liturgy. On December 1, 1964, the Diocese received a complaint alleging that Father Brett had sexually molested a 19-year-old Sacred Heart student ("T.F."). The Diocese's report of the matter indicates that Father Brett admitted the accuracy of T.F.'s complaint. (Pl.'s Ex. 15.) Father Brett informed the Diocesan officials that "his problem," which he "discovered" while in Stamford, was known to only a small number of other people. The report noted that T.F. "was worried about other boys who had gone to New York with Father Brett," although Father Brett "denie[d] that anything happened on those occasions." The report concluded that Father Brett was to be removed from his duties and "a recurrence of hepatitis was to be feigned should anyone ask."

Ultimately, Father Brett was dispatched to New Mexico for several months of psychiatric treatment. Thereafter, the Diocese consistently turned down his requests to resume work as a priest in Connecticut. However, the Diocese continued to provide him with financial support and took no steps to alter his status as a priest. For the next few years, Father Brett spent time in California, New Mexico, Maryland, and Connecticut, functioning in a variety of ecclesiastical and nonecclesiastical positions. In 1992 and 1993, allegations of sexual abuse arose in connection with his sojourns in New Mexico and California.

In January of 1966, while Father Brett was serving as a parish priest in New Mexico, the Bridgeport Diocese became aware of another complaint relating to Father Brett's time in Connecticut. Specifically, in late 1963, Father Brett was alleged to have offered a "solicitation to homosexual misconduct" to a high school student in Bridgeport. The boy ("M.F.")—whom plaintiff has identified as one of "Brett's Mavericks"—indicated that he declined Father Brett's offer and terminated his relationship with the priest. A year later, M.F. brought the incident to the attention of the pastor of Saint Cecilia, who apparently did not refer the complaint to diocesan authorities. However, when M.F. subsequently required hospitalization for psychiatric reasons, his parents decided to approach diocesan officials directly, hoping to obtain remuneration for the mental illness they attributed to Father Brett's overture.

In a letter detailing the M.F. incident and the Diocese's response, Bishop Curtis observed as follows:

> In the original complaint against Father Brett [T.F.'s complaint] the name of [M.F.] was not mentioned. In the interview, however, with Msgr. Kearney, when he admitted the homosexual attack upon another student, Father Brett seemed to indicate that there was at least one other incident. I have no way of knowing whether this might have been the case of [M.F.] or not.

> [M.F.] probably became aware of Father Brett's disappearance from the diocese because the high school is close to the university. However, I doubt that he knew the precise reason since the incident involving the university student did not become known, and the departure of Father Brett was accomplished very quietly. Factually, in February of 1964 Father Brett had been hospitalized for an attack of hepatitis and in April was released a second time after a relapse in health for this same problem. Hence those who knew him would have judged that his health failed again.

> . . .

Nor was the Diocese of Bridgeport negligent, as the parents hint, since it was unaware of the incident.

The Diocese has given no information to [M.F.'s family] on the reason for Father Brett's absence. They claim however to know of the priest's psychiatric problem, but no admission of this has ever been made to them.

(Pl.'s Ex. 11.) The Diocese apparently declined to provide support for M.F.'s psychiatric care or to take other affirmative steps in response to the allegations.

Notwithstanding the second allegation of misconduct, Father Brett continued to function in his capacity as a priest under the auspices of the Diocese of Bridgeport. He ultimately settled in Maryland and developed a successful career as a writer, inspirational speaker, retreat leader, and television minister. Meanwhile, plaintiff has allegedly suffered ongoing psychiatric problems, resulting in difficulties with relationships and the need for counseling and psychotherapy.

### Discussion

#### A. Standard

In a motion for summary judgment, the moving party must initially demonstrate that there are no material facts in dispute and "[a]ll reasonable inferences and any ambiguities are drawn in favor of the non-moving party." *Thompson v. Gjivoje*, 896 F.2d 716, 720 (2d Cir.1990). Once the moving party has met its burden, "the non-moving party, in order to defeat summary judgment, must come forward with evidence that would be sufficient to support a jury verdict in his favor." *Goenaga v. March of Dimes Defects Foundation*, 51 F.3d 14, 18 (2d Cir.1995); *Celotex Corp. v. Catrett*, 477 U.S. 317, 332, 106 S.Ct. 2548, 2557, 91 L.Ed.2d 265 (1986). "[A] party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of his pleading, but ... must set forth specific facts showing that there is a genuine issue for trial.'" *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986) (quoting *First Nat'l Bank of Arizona v. Cities Service Co.*, 391 U.S. 253, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968)).

#### B. Statute of Limitations

Connecticut has provided a special extended statute of limitations for actions relating to the sexual abuse of minors. "[N]o action to recover damages for personal injury to a minor, including emotional distress, caused by sexual abuse, sexual exploitation or sexual assault may be brought by such person later than seventeen years from the date such person attains the age of majority." Conn. Gen.Stat. § 52–577d. There is no dispute that plaintiff attained the age of majority on August 3, 1965. Plaintiff filed the present lawsuit on July 27, 1993, nearly 28 years after he turned 18. Absent tolling of the statute of limitations, the present action is plainly time-barred.

For purposes of tolling the statute, plaintiff relies on the doctrine of fraudulent concealment. Under Conn. Gen.Stat. § 52–595, "If any person, liable to an action by another, fraudulently conceals from the existence of the cause of such action, such cause of action shall be deemed to accrue against such person so liable therefor at the time when the person entitled to sue thereon first discovers is existence." The Diocese argues that § 52–595 is not applicable to actions for sexual abuse of minors, because the legislature has already set forth an extremely generous statute of limitations for such actions. However, as the Court stated at oral argument on February 5, 1997, the parties' dispute over this issue is easily resolved by reference to the Connecticut Supreme Court's decision in *Connell v. Colwell*, which held, "[W]e conclude that the exception contained in § 52–595 constitutes a clear and unambiguous general exception to any statute of limitations that does not specifically preclude its application." 214 Conn. 242, 246 n. 4, 571 A.2d 116 (1990). The Diocese does not argue that § 577d "specifically precludes" application of the fraudulent concealment doctrine; nor does it appear that such an argument could be made. Therefore, the Court concludes that § 52–595 may provide an exception to the statute of limitations set forth in § 577d.

■ Next, the Diocese argues that § 52–595 is inapplicable because plaintiff was in fact aware of his cause of action well before the filing of his suit. Plaintiff contends that he repressed his memories of the encounters with Father Brett until October of 1991. However, the Diocese claims that various admissions made by plaintiff in his deposition suggest otherwise. Plaintiff recalled that, following his experiences with Father Brett, "At some point—and I don't remember when—there was a sense that things like this might be happening to the three of us [i.e., plaintiff and two high school friends who were also acquainted with Father Brett] and I don't ever remember having a conversation like let's sit down and talk about the things that have been happening." (Martinelli Depo., at 69.) While this statement may cast some doubt on plaintiff's account of repressed memory, the import of the statement is sufficiently ambiguous ("things like this *might* be happening to us") that it does not remove plaintiff's knowledge of abuse from the realm of genuinely disputed issue of fact.

At his deposition, plaintiff further stated, "I remember a conversation with my wife and I think in passing I may have mentioned that I had had a sexual experience with a priest." (Martinelli Depo., at 150.) However, he could not recall the date of this conversation any more precisely than that it occurred between 1987 and October 1991. (Martinelli Depo., at 150, 177.) Thus, plaintiff's deposition does not conclusively establish any awareness of his cause of action at an early enough date such that his complaint, filed in July of 1993, would necessarily be time-barred.

■ Finally, the Diocese argues that plaintiff has made an insufficient evidentiary showing of fraudulent concealment so as to avoid summary judgment. In order to prove fraudulent concealment under § 52–595,

plaintiffs [are] required to show: (1) a defendant's actual awareness, rather than imputed knowledge, of the facts necessary to establish the plaintiff's cause of action; (2) that defendant's intentional concealment of these facts from the plaintiffs; and (3) that defendant's concealment of the facts for the purpose of obtaining delay on the plaintiff's part in filing a complaint on their cause of action.

*Bartone v. Robert L. Day, Inc.*, 232 Conn. 527, 533, 656 A.2d 221 (1995). There is little dispute that the Diocese intended to conceal Father Brett's misconduct. (Def.'s Mem. in Support of Summ. J., at 27.) Nor can there be much doubt that the Diocese acted on this intent, as by removing Father Brett from the state as quickly as possible after the incident involving T.F. and providing a false explanation for his disappearance, which is evidenced by the letter of December 7, 1964, from Father Kearney to Father McManus. It is somewhat less clear that the acts of concealment were directed towards delaying or preventing legal action per se. However, such a specific intent may be reasonably inferred from the Diocese's experience with M.F.'s family and the documents memorializing that experience. The M.F. incident demonstrated to the Diocese that Father Brett's misconduct could result in psychological harm to the victims, that treatment of such harm might involve hospitalization and professional therapy, and that victims' parents might seek compensation from the Diocese for such treatment. It is but a small step from this knowledge to awareness of potential legal liability. Indeed, Bishop Curtis's letter concerning the incident betrays an intent to find excuses for avoiding the financial obligations arising from Father Brett's actions. (Pl.'s Ex. 11.) Construing all reasonable inferences in plaintiff's favor, the Court concludes that plaintiff has established the existence of a genuine dispute as to the Diocese's intent to avoid legal liability to Father Brett's victims.

■ The most difficult issue presented by plaintiff's fraudulent concealment claim pertains to the Diocese's actual knowledge of plaintiff's cause of action.[3] The Diocese

---

**3.** This is the first prong of the inquiry from *Bartone* described *supra.* However, lack of knowledge of plaintiff's cause of action is also implicated in the other two prongs, insofar as defendant's acts of concealment must be directed towards the plaintiff, and defendant's acts must be "for the purpose of obtaining delay on the plaintiff's part in filing a complaint." 232 Conn. at 533, 656 A.2d 221. It is difficult to see how these requirements could be fully satisfied in the

correctly notes that the name "Frank Martinelli" appeared nowhere in the Diocese's voluminous file on Father Brett prior to the initiation of the present lawsuit. Plaintiff offers no evidence to suggest that the Diocese was otherwise aware of the facts upon which the present cause of action is based. Accordingly, the Diocese argues that, at worst, it undertook acts of concealment directed towards the general public, and that such general acts may not support a claim of fraudulent concealment.

■ At oral argument, plaintiff virtually conceded that he could not meet the strict requirements for showing fraudulent concealment under *Bartone*. However, plaintiff argues that the present circumstances demand relaxation of those standards. Specifically, plaintiff contends that the Diocese should not be permitted to take advantage of its ignorance now when its ignorance was the result of a failure to fulfill a duty to investigate and warn. Although Connecticut courts do not appear to have squarely addressed this particular claim, the Court finds ample support in the case law for the proposition that a defendant may not avoid application of § 52–595 by relying on the violation of a legal duty. *See Hamilton v. Smith*, 773 F.2d 461, 468 (2d Cir.1985) (noting that under Connecticut law of fraudulent concealment, requirement of affirmative act of concealment not applicable *when defendant under fiduciary obligation to plaintiff*); *Lapuk v. Simons*, 1995 WL 5633, *16 (Conn.Super.1995) (Corradino, J.) (holding that for purposes of § 52–595, affirmative act may not be necessary where fiduciary relationship gives rise to "affirmative duty to disclose"); *Manufacturers Hanover Trust Co. v. Stamford Hotel*

*Limited Partnership*, 1994 WL 720368, *3 (Conn.Super.1994) (Karazin, J.) (denying motion for summary judgment on counterclaim plaintiff's § 52–595 claim where factual disputes exist as to intent of counterclaim defendant and legal nature of relationship between the parties). *See also A.M. v. Roman Catholic Church*, 669 N.E.2d 1034, 1038 (Ind. Ct.App.1996) ("An equitable estoppel under the doctrine of fraudulent concealment can arise either from an active effort to conceal a cause of action or from the violation of a fiduciary or confidential relationship."); *Koenig v. Lambert*, 527 N.W.2d 903, 906 (S.D. 1995) ("[I]f a trust or confidential relationship exists between the parties, which imposes a duty to disclose, mere silence by the one under that duty constitutes fraudulent concealment."). Accordingly, the Court concludes that plaintiff may demonstrate § 52–595 to be applicable notwithstanding the Diocese's ignorance of his cause of action if plaintiff can show that the Diocese's ignorance was the result of a violation of a legal duty to plaintiff to investigate and warn.

■ Plaintiff contends that such a legal duty arose by virtue of a fiduciary relationship between himself and his parents on the one hand and the Diocese on the other.[4] A fiduciary relationship may be found to exist where "there is a justifiable trust confided on one side and a resulting superiority and influence on the other." *Dunham v. Dunham*, 204 Conn. 303, 320, 528 A.2d 1123 (1987) (citation omitted). The Diocese argues that such a relationship may not be found under the present circumstances because it was unaware of the existence of the Martinelli family. However, it is undisputed that the Martinellis were active members of their par-

---

absence of a showing that defendant had actual knowledge of plaintiff and plaintiff's cause of action.

**4.** Plaintiff also relies on Conn. Gen.Stat. § 17–38a, which imposes reporting requirements on members of the clergy who suspect abuse of a minor. Yet it is undisputed that clergy members were only added to this statute by amendment effective October 1, 1971, well after the events constituting plaintiff's abuse, the revelations of the incidents involving T.F. and M.F., and the attainment of plaintiff's majority. Plaintiff therefore seeks retroactive application of the 1971 amendment. However, the Connecticut Su-

preme Court has "consistently ... expressed reluctance to construe statutes retroactively." *Gil v. Courthouse One*, 239 Conn. 676, 685, 687 A.2d 146 (1997). Because plaintiff has failed to show a clear legislative intent to apply the 1971 amendment retroactively, or indeed to cite any authority in support of his position, the Court concludes that plaintiff's reliance on § 17–38a is misplaced. In the absence of a statutory basis for the Diocese's alleged duty to disclose, plaintiff must identify a common-law basis for the Diocese's duty, which plaintiff seems to have done by claiming that the Diocese owed him a fiduciary obligation.

ish, that plaintiff received sacraments and attended catechism classes through the parish, that plaintiff spent much time with Father Brett, and that plaintiff's parents knew and approved of the time their son was spending with the priest, (Martinelli Depo., at 61). Plaintiff also argues that the very nature of the relationship between church and parishioner compels the finding of a fiduciary relationship between the two. *See Koenig*, 527 N.W.2d at 906 ("Certainly if there is a trust relationship in those instances [e.g., attorney and client] there must also be one between a Diocese and the members of the faith it purports to serve."). While the Court is unwilling to find a fiduciary relationship as a matter of law on the present record, plaintiff has at least demonstrated there to be a genuine factual dispute over the existence of such a relationship. *See Dunham*, 204 Conn. at 320–21, 528 A.2d 1123 (holding that because Connecticut Supreme Court has declined "to define a fiduciary relationship in precise detail and in such a manner to exclude new situations," trial court properly submitted existence of fiduciary relationship to jury).

The Connecticut Supreme Court has made clear that a fiduciary is a "trustee who must act in scrupulous good faith and candor.... [The fiduciary] must act honestly, and with the finest and undivided loyalty to the trust." *Konover Development Corp. v. Zeller*, 228 Conn. 206, 220, 635 A.2d 798 (1994) (internal quotation marks omitted). The present record provides ample support for plaintiff's contention that the Diocese put its own interests above those of the young men who came into contact with Father Brett. The Diocese's inquiry into the incident involving T.F. raised concerns about other victims: T.F. "said he was worried about other boys who had gone to New York with Father Brett"; "One other SHU student knows of his problem, but Fr. Brett is sure that he wishes to forget the whole thing"; "Fr. Brett said that he discovered his problem in Stamford, and had been involved there." (Pl.'s Ex. 15.)

Yet, the Diocese apparently conducted no inquiry to determine the identities of other victims. Plaintiff maintains that his identity as a victim could have been readily ascertained, as he belonged to a group of young friends who were known to spend much time with Father Brett. Moreover, the subsequent revelation of a sexual incident involving a member of the group, M.F., put the Diocese on even clearer notice that there were more victims and rendered plaintiff's identity even more easily ascertainable. Given these circumstances, and assuming the existence of a fiduciary relationship between a diocese and a family who entrusts an adolescent to the care of a priest, plaintiff has at least offered a genuine dispute as to whether the Diocese's ignorance of his cause of action was caused by a violation of a fiduciary duty.[5]

Plaintiff's reliance on the fraudulent concealment exception to the statute of limitations raises a number of difficult legal and factual questions, and the ultimate trier of fact might well reject plaintiff's account of when he became aware of his cause of action, of the nature of the obligations owed to him by the Diocese, and of the Diocese's actions and intentions. However, plaintiff has at least succeeded in demonstrating there to be genuine, material factual disputes relating to fraudulent concealment. Accordingly, the Court concludes that the Diocese is not entitled to summary judgment on its statute of limitations defense.

### C. Vicarious Liability

 The Diocese argues that it may not be held vicariously liable for Father Brett's misconduct because Father Brett's sexual activity was beyond the scope of his employment. "It is well established that an employer is liable for the wilful torts of his employee when they are committed within the scope of his employment and in furtherance of the employer's business." *Cardona v. Valentin*, 160 Conn. 18, 22, 273 A.2d 697 (1970). "The test in Connecticut as to

---

**5.** Plaintiff contends that if a fiduciary relationship can be demonstrated between the Diocese and himself, then the burden fall on the Diocese to disprove a violation of fiduciary duty. However, the Court need not resolve the proper alloca-

tion of burdens of proof at present, for it is clear that, even if the ultimate burden lies with plaintiff, plaintiff has sufficiently satisfied that burden for purposes of avoiding summary judgment.

whether an employee is acting within the scope of his or her employment rests on whether the employee was furthering the employee's business." *Nutt v. Norwich Roman Catholic Diocese,* 921 F.Supp. 66, 70 (D.Conn.1995) (Covello, J.). *See also Gutierrez v. Thorne,* 13 Conn.App. 493, 498, 537 A.2d 527 (1988) ("[I]t must be the affairs of the principal, and not solely the affairs of the agent, which are being furthered in order for the doctrine [of respondeat superior] to apply."). Generally, this test constitutes a question of fact for the jury to decide. *Nutt,* 921 F.Supp. at 70.

 Plaintiff argues, and the Diocese does not appear to dispute, that at least certain aspects of the relationship between plaintiff and Father Brett advanced the Diocese's interests. Specifically, plaintiff contends that Father Brett sought to disseminate knowledge about, and interest in, the reforms of the Roman Catholic liturgy and the administration of sacraments that occurred in the early 1960s, and that much of Father Brett's contact with plaintiff and the other members of "Brett's Mavericks" was directed towards this end. (Martinelli Depo., at 43–53.) The Diocese argues that any incidents of sexual abuse were wholly distinct from Father Brett's efforts to involve "Brett's Mavericks" in liturgical reform; however, plaintiff has alleged that at least one sexual encounter was presented to him as similar to Holy Communion. (Compl., ¶ 6(b).) Moreover, another incident occurred immediately after plaintiff received the sacrament of reconciliation in an unorthodox fashion. (Martinelli Depo., at 40, 63.) Such circumstances—in which sexual abuse was directly connected with the administration of sacraments in the context of a broader effort by the abuser to educate and interest the victim in liturgical reform—distinguish the present case from *Nutt, Gutierrez,* and the other cases on which the Diocese relies, and raise a genuine factual dispute as to whether the sexual encounters between plaintiff and Father Brett were "the culmination of [ ] transaction[s] related directly to [Father Brett's] duties" to administer and promote the sacraments. *See Wilson v. R.F.K. Corp.,* 19 Conn.App. 548, 553, 563 A.2d 738 (1989). While plaintiff will face a daunting burden at trial, *see Tichenor v. Roman Catholic Church of New Orleans,* 32 F.3d 953, 960 (5th Cir. 1994) ("It would be hard to imagine a more difficult argument than that Cinel's illicit sexual pursuits were somehow related to his duties as a priest or that they in any way furthered the interests of St. Rita's, his employer."), in the context of the present motion the Court must draw all reasonable inferences and any ambiguities in favor of the plaintiff. Accordingly, the Court declines to grant summary judgment as to whether Father Brett's misconduct occurred within the scope of his employment.

 Nor is the Court persuaded otherwise by the Diocese's claims that Father Brett's actions violated Roman Catholic teachings on homosexuality and priestly celibacy. "That the servant disobeyed the orders of the master is never a sufficient defense. It must be shown further that he ceased to act for the master and in the course of his employment." *Son v. Hartford Ice Cream Co.,* 102 Conn. 696, 701, 129 A. 778 (1925) (citation omitted); *see also Pelletier v. Bilbiles,* 154 Conn. 544, 548, 227 A.2d 251 (1967). When an employee deviates from an employer's instructions, liability turns on the extent of the deviation, in light of the totality of the circumstances, which is generally a question of fact for the jury. *Garriepy v. Ballou & Nagle, Inc.,* 114 Conn. 46, 51, 157 A. 535 (1931). In the present case, plaintiff has raised a genuine dispute as to whether or not Father Brett's sexual activities represented a total departure from the Diocese's business; therefore, summary judgment is inappropriate.

### D. Other Bases of Liability

The Diocese moves for summary judgment on plaintiff's claims insofar as they are premised on the Diocese's knowledge of Father Brett's dangerous proclivities prior to or contemporaneous with his sexual abuse of the plaintiff. Specifically, the Diocese seeks summary judgment as to counts 1, 3, 4, 5, and 7. The Court understands these counts to encompass two distinct types of claims: 1) that the Diocese violated a duty to prevent the sexual abuse of plaintiff *before* it oc-

curred, and 2) that the Diocese violated a duty to notify plaintiff, plaintiff's parents, or other authorities of the abuse *after* it occurred. Count 3 (breach of fiduciary duty to disclose abuse) implicates only a failure-to-notify theory; Count 7 (negligent training and supervision) implicates only a failure-to-prevent theory; while Counts 1 (intentional infliction of emotional distress), 4 (negligent infliction of emotional distress), and 5 (negligent retention) appear on their face to implicate both theories of liability.

Plaintiff's response to the Diocese's motion for summary judgment as to these counts lacks clarity. However, plaintiff seems to argue that the Diocese's lack of antecedent knowledge is not relevant to the post-hoc failure-to-notify aspect of counts 1, 3, 4, and 5. The Court agrees. Assuming, *arguendo*, that the Diocese had a duty to notify as a result of what it learned from the T.F. and M.F. incidents, as plaintiff claims, the Diocese's knowledge prior to the revelations of late 1964 has no apparent bearing on its liability under a failure-to-notify theory. Although the Diocese argues that it had no fiduciary duty to plaintiff to provide notice of Father Brett's misconduct, the Court has found there to be a genuine, material dispute as to this claim. Because the Diocese has not otherwise challenged the failure-to-notify aspect of counts 1, 3, 4, and 5, plaintiff is permitted to proceed with those counts at least under a failure-to-notify theory.

■ As to the failure-to-prevent claims, the Diocese's antecedent knowledge has greater relevance. "The ultimate test of the duty [under the negligence standard] is to be found in the reasonable foreseeability of harm resulting from a failure to exercise reasonable care. This does not mean foreseeability of any harm whatsoever or foreseeability of the particular injury which happened. Rather, the test is: Would the ordinarily prudent man in the position of the defendant, knowing what he knew or should have known, anticipate that harm of the general nature of that suffered was like-ly to result." *Nutt,* 921 F.Supp. at 74 (citations and internal quotation marks omitted).

■ At the outset, the Court notes that it is not entirely clear whether plaintiff seeks to proceed under a failure-to-prevent theory; if so, plaintiff's briefs continually conflate this theory with the failure-to-notify theory. Assuming, *arguendo,* that plaintiff still claims that the Diocese should have taken actions to prevent his abuse, the Court will review the evidence offered by plaintiff that might support such a claim. First, plaintiff argues that the Diocese did little to "discover" Father Brett's "state of mind" before hiring him. However, the Diocese's personnel file on Father Brett contains dozens of pages of pre-ordination documents concerning Father Brett's background, qualifications, and recommendations. Plaintiff does not specify what more the Diocese could have done to "discover" Father Brett's "state of mind." Nor has plaintiff shown that Father Brett's predilections were in any way developed or discernible prior to his ordination.[6] Plaintiff argues that Father Brett was "irresponsible and pleasure-seeking" in his seminary days, (Pl.'s Mem. in Opp., at 14), but in support of that claim cites only a letter denying Father Brett permission to travel in Europe for financial reasons, (Pl.'s Ex. N). The fact that Father Brett's travel plans exceeded his financial resources simply does not give rise to an inference that his pedophilia was foreseeable.

Plaintiff elsewhere cites a letter of recommendation from Father Brett's seminary to the Diocese, in which there was an allusion to Father Brett's "need of guidance in the first years of his priestly work." (Pl.'s Ex. J.) However, the letter contains no mention of sexual tendencies or psychiatric difficulties; rather, the letter focusses on Father Brett's academic strengths and weaknesses. Read in context, Father Brett's "need of guidance" seems to refer to his intellectual immaturity, and does not raise a reasonable suspicion that he would later sexually abuse young men. Finally, plaintiff notes that Father Brett never took a course in psychology or

---

6. Indeed, in language that plaintiff himself relies on the demonstrate that the Diocese was on notice of other victims at Saint Cecilia, Father Brett informed diocesan officials in connection with the inquiry into the T.F. incident, "that he discovered his problem in Stamford."

human sexuality. However, the content of Father Brett's academic studies seems of minimal probative weight as to the foreseeability that he would engage in such morally and legally wrongful behavior as is presently alleged.

In sum, plaintiff has not offered evidence that could reasonably give rise to an inference that his sexual abuse was the foreseeable result of any action or omission by the Diocese. There is no genuine dispute as to whether an ordinarily prudent person would have acted differently than the Diocese prior to the revelations of 1964 and thereby prevented the abuse.[7] Accordingly, the Diocese is entitled to summary judgment as to any failure-to-prevent theory being pursued by plaintiff in connection with counts 1, 4, 5, and 7.

### Conclusion

For the foregoing reasons, Defendant's Motion for Summary Judgment (Doc. 42) is GRANTED in part and DENIED in part. Specifically, summary judgment is DENIED with respect to defendant's statute of limitations defense; count 6 (respondeat superior); count 3 (breach of fiduciary duty to disclose); and counts 1 (intentional infliction), 4 (negligent infliction), and 5 (negligent retention) insofar as they are premised on the defendant's failure to provide notice of Father Brett's misconduct. Summary judgment is GRANTED with respect to count 7 (negligent training and supervision), and counts 1, 4, and 5 insofar as they are premised on defendant's failure to prevent plaintiff's sex abuse.

IT IS SO ORDERED.

---

7. If the Diocese did not act negligently prior to 1964, *a fortiori*, the Diocese did not act intentionally to inflict emotional distress on plaintiff (count 1).