ROBERT GOUGH *v.* SAINT PETER'S EPISCOPAL
CHURCH ET AL.
(AC 34836)

Robinson, Alvord and Peters, Js.

Argued March 12—officially released July 2, 2013

*Vincent M. DeAngelo*, with whom, on the brief, was *M. Hatcher Norris*, for the appellant (plaintiff).

*Jamie M. Landry*, with whom was *Bradford S. Babbitt*, for the appellees (defendants).

*Opinion*

ALVORD, J. The plaintiff, Robert Gough, appeals from the summary judgment rendered by the trial court in favor of the defendants, Saint Peter's Episcopal Church of South Windsor, Connecticut (St. Peter's) and the Episcopal Diocese of Connecticut (diocese), on his

claims of negligence and breach of fiduciary duty. On appeal, the plaintiff claims that the court improperly concluded that there were no genuine issues of material fact as to whether the defendants owed the plaintiff a duty because they knew or should have known that Bruce Jacques, a priest employed by the defendants, had or would sexually abuse members of St. Peter's. We affirm the judgment of the court.

The record reveals the following uncontested facts. St. Peter's is an ecclesiastical society that is a member of the diocese. Jacques was an ordained priest in the Protestant Episcopal Church (church), and he was employed as a priest at St. Peter's from September 19, 1976 to September 9, 1984.

The plaintiff's operative complaint, which was filed on June 9, 2011, alleges the following. The plaintiff served as an acolyte[1] at St. Peter's from 1976 to 1983, beginning when he was twelve years old. During the spring of 1977, the plaintiff was alone at St. Peter's performing his acolyte duties when he was approached by Jacques.[2] Jacques invited the plaintiff into the priest's office and told the plaintiff that he was conducting research about how children physically mature. He told the plaintiff that other acolytes at St. Peter's were participating in the research and asked the plaintiff if he would participate. When the plaintiff agreed, Jacques proceeded to ask the plaintiff sexually related questions, stroke the plaintiff's penis and perform oral sex on the plaintiff (incident). Afterward, Jacques told the

---

[1] The plaintiff averred that, "[a]s an acolyte, we assisted during church service, helped clean the church, helped clean the property, shared meals together, assisted in church fundraising efforts and took trips together, both out of state as well as day trips within the state of Connecticut."

[2] The operative complaint provides that the incident occurred in either 1977 or 1978, and it does not provide that the plaintiff was serving in his capacity as an acolyte on the day of the incident. The subsequent affidavit and deposition testimony of the plaintiff provide these details, and the defendants do not contest these facts.

plaintiff that he could not tell anyone about what had occurred or else the plaintiff would be removed from the acolyte guild and barred from returning to St. Peter's. Subsequently, Jacques made two similar advances toward the plaintiff, but the plaintiff avoided further sexual encounters by telling Jacques that he was not feeling well and declining to participate in Jacques' research. As to these allegations, the defendants' answers provide that both St. Peter's and the diocese lacked sufficient information to form a belief as to their truth and, therefore, left the plaintiff to his proof.

The operative complaint contains four counts: (1) negligence as to St. Peter's; (2) negligence as to the diocese; (3) breach of fiduciary duty as to St. Peter's; and (4) breach of fiduciary duty as to the diocese.[3] The defendants' answers advanced special defenses, including that neither St. Peter's nor the diocese possessed knowledge that would give rise to a duty owed to the plaintiff. On November 30, 2011, the defendants filed a motion for summary judgment, arguing, inter

---

[3] Specifically, each of the four counts alleged that each defendant: (1) failed to use reasonable care to properly and adequately supervise the activities of Jacques at St. Peter's in order to prevent the sexual battery of minors; (2) knew or reasonably should have known of Jacques' inability to control his sexual impulses; (3) retained Jacques as a priest at St. Peter's despite his exploitation of his position of trust with the acolytes; (4) failed to use reasonable care in evaluating Jacques as to his fitness to work with acolytes and young members of the church; (5) allowed Jacques to act as a priest when they knew or by reasonable care should have known that he had engaged in inappropriate conduct with the plaintiff and others; (6) failed to investigate the conduct of Jacques despite the fact that they knew or by reasonable care should have known that he engaged in inappropriate conduct with the plaintiff and others; (7) failed to both promulgate and enforce adequate policies to prevent clergy such as Jacques from engaging in inappropriate physical contact with parishioners such as the plaintiff; and (8) failed to establish, maintain and enforce a policy of reporting, investigating and removing priests engaged in sexual misconduct and instead adhered to a policy of discouraging the dissemination of information regarding the sexual misconduct of priests.

alia, that the plaintiff could not prevail on his negligence or breach of fiduciary duty causes of action because he could not prove that the defendants knew or should have known that Jacques had or would abuse members of St. Peter's.

In support of their motion for summary judgment, the defendants provided the court with the following materials. Attached to an affidavit of the secretary for the diocese, John W. Spaeth III, the defendants submitted exhibits that were made in the ordinary course of the procedure by which one became an ordained priest in the church. The exhibits included letters recommending Jacques' application to become a seminary student; a certificate providing that Jacques possessed the moral character to become a deacon signed by the majority of the members of the vestry at St. Peter's Episcopal Church in Cheshire, Connecticut (St. Peter's–Cheshire), the church that Jacques attended prior to becoming ordained; letters from the rector of the Christ Church and a bishop of Connecticut recommending that Jacques be ordained; and the testimonials of the standing committee for ordination to the priesthood and the standing committee of the diocese recommending Jacques for ordination to the priesthood. The exhibits also included a document titled "notice of sentence of deposition," dated September, 1997, which evidenced Jacques' punishment for two separate violations of the canons of the church, neither of which directly relate to the alleged incident between Jacques and the plaintiff.[4]

The defendants also provided the court with the affidavit of Jacques' former wife, Martha Sue Jacques, who averred, inter alia, the following. Martha Sue Jacques has known Jacques since she was thirteen years old,

[4] Spaeth averred that the incident that gave rise to Jacques' sentence of deposition was a 1995 complaint from a parishioner of St. John's Church in New Milford, where Jacques was then employed, that Jacques had solicited sex from the complainant's son.

when they both were parishioners at St. Peter's–
Cheshire. They married in 1972, and after Jacques was
ordained a deacon, he accepted a position at Trinity
Episcopal Church in Torrington (Trinity). From 1974
until 1976, Jacques worked at Saint Mary's Episcopal
Church in Manchester (St. Mary's); from 1976 until 1984,
Jacques worked at St. Peter's; and from 1984 until 1995,
Jacques worked at St. John's Episcopal Church in New
Milford (St. John's). While at St. Peter's and Trinity,
Jacques led groups of teenaged members of the church
and chaperoned young church members on activities
and trips. During that time, Martha Sue Jacques
observed Jacques' interactions and spoke with parishio-
ners at both St. Peter's and Trinity, and at no time did
any person tell, suggest, intimate or hint to her of—nor
did she witness—any behavior suggesting that Jacques
had acted or might act inappropriately in any manner,
sexually or otherwise, toward any member of the parish
or any other person.

The defendants provided eleven additional affidavits
from longtime friends of Jacques, fellow clergy who
worked alongside Jacques, lay members of the church
who served on the vestry or worked with Jacques over-
seeing the acolyte guild, and members of the calling
committee that hired Jacques at St. Peter's. These
eleven people,[5] who knew Jacques during his years at
Trinity, St. Mary's, St. Peter's and St. John's, averred

---

[5] The affidavits were from: (1) a longtime friend and priest; (2) a reverend
who ran an educational program and, in that capacity, met with Jacques
weekly for nine months; (3) the rector at St. Mary's from 1974 to 1984 who
selected Jacques to serve as assistant rector at St. Mary's; (4) an attorney
who was an active parishioner at St. Mary's, serving on the vestry and later
as warden; (5) a parishioner at St. Mary's from 1966 to 1987, who served
on the vestry and later as warden; (6) a member of the church who worked
with Jacques as a leader of the acolyte guild at both at St. Peter's and St.
Mary's; (7 and 8) two members of the calling committee at St. Peter's that
hired Jacques to the position of vicar; (9 and 10) two active parishioners
who knew Jacques when he worked at Trinity; and (11) an ordained bishop
in the church who served as rector at St. Peter's from 1944 to 1971.

much the same as did Martha Sue Jacques—they never witnessed or heard anything suggesting that Jacques might act or had acted inappropriately in any manner, sexual or otherwise, toward any person.

The defendants also provided the court with affidavits of three bishops within the diocese, who averred as to the church's policies at the time of the incident. The Right Reverend Morgan Porteus averred that, in considering the ordination of a priest, the church required that the candidate undergo two psychiatric examinations and an examination by a ministry commission composed of both lay and ordained members of the church, that a standing commission of the diocese had to be satisfied that the candidate had "lived a sober, honest and godly life," and that members of the candidate's home parish—including that parish's rector—had to attest to the candidate's moral character. One of the purposes for this thorough process, Porteus averred, was to ensure that the candidate would not pose a threat to members of the church. The Right Reverend Arthur E. Walmsley averred that, pursuant to church policy, any suspected abuse by a member of the clergy was to be promptly reported to the bishop, and that the church does not discourage either the dissemination of information regarding sexual misconduct of priests with minors or compliance with the law requiring such disclosure. The Right Reverend Ian T. Douglas averred that the church had "strong policies in place that prohibited members of the clergy from engaging in any form of abuse of others, including but not limited to sexual abuse of members of the church." Further, Douglas averred that this policy would have been known to anyone seeking to become ordained, as it was central to the aforementioned process of ordination and it was part of the bishop's charge of ordination given to a new priest.

In support of their motion for summary judgment, the defendants also submitted excerpts from the deposition testimony of the plaintiff and Shirley Hallin Zeidler. The plaintiff testified that he was sexually abused by Jacques in the spring of 1977 and that he did not tell anyone about the incident until 2000. Further, he testified that allegations of this nature against Jacques did not become public knowledge until 1995, and that he did not believe that anyone at St. Peter's knew that Jacques sexually abused him or anyone else at any time. Zeidler testified that she and her husband became friends with Jacques and his wife while at St. Mary's, and that she and her husband worked with Jacques as advisors and chaperones for the acolyte guild. Further, she testified that after the allegations of sexual abuse against Jacques became public in 1995, Zeidler, her husband and Martha Sue Jacques searched through their collective memories for any indications of Jacques' sexually abusive nature, but they could not remember Jacques presenting any warning signs.

On March 6, 2012, the plaintiff filed an opposition to the defendants' motion for summary judgment. Attached thereto, the plaintiff submitted as exhibits further excerpts from his deposition testimony, his own affidavit, and further excerpts from Zeidler's deposition testimony.[6] The plaintiff's testimony and affidavit provided details about the circumstances surrounding the incident, including that the plaintiff was fearful of telling anyone about the incident because of Jacques' threat, that the plaintiff did not tell his parents when they picked him up from St. Peter's that day and that the plaintiff did not tell anyone about the incident for the next seventeen years. The testimony of Zeidler provided that, in 1976, she was not aware of any background

---

[6] In addition, the plaintiff submitted excerpts from the deposition testimony of Martha Sue Jacques and the defendants' responses to certain interrogatories.

checks that the church conducted on priests or the existence of "safe church" training, which exists in the church today and includes prohibiting priests from being alone with a child. She averred that, at the time of the incident, the diocese held conferences for youth group leaders, such as leaders of the acolyte guild, but she did not recall any directive by the diocese that priests should avoid one-on-one contact with children.

On July 5, 2012, the court granted the defendants' motion for summary judgment. The court determined that the evidence presented by the plaintiff was sufficient to create an issue of fact as to whether the defendants had a fiduciary relationship with the plaintiff, but the court concluded that "the undisputed evidence establishes that those who knew Jacques before and during his service at St. Peter's had no knowledge, no suspicion and no basis for any knowledge or suspicion that Jacques had abused or would abuse anyone. Thus, there is no genuine issue of material fact concerning whether the defendants should have anticipated the harm of the general nature of that suffered was likely to result. . . . In other words, it was not reasonably foreseeable to the defendants that Jacques would abuse the plaintiff." (Citation omitted; internal quotation marks omitted.) Thus, the court concluded that "[although] there may be a fiduciary relationship between the parties, absent a basis for knowing Jacques posed a risk of harm, neither St. Peter's nor the [d]iocese violated any fiduciary duty to the plaintiff. . . . Therefore, summary judgment is granted for the defendants as to [all] counts . . . ." This appeal followed.

We begin our review of the summary judgment rendered by the trial court by setting forth our well established standard of review. "Practice Book § [17-49] provides that summary judgment shall be rendered forthwith if the pleadings, affidavits and any other proof submitted show that there is no genuine issue as to any

material fact and that the moving party is entitled to judgment as a matter of law. . . . In deciding a motion for summary judgment, the trial court must view the evidence in the light most favorable to the nonmoving party. . . . The party seeking summary judgment has the burden of showing the absence of any genuine issue [of] material facts which, under applicable principles of substantive law, entitle him to a judgment as a matter of law . . . and the party opposing such a motion must provide an evidentiary foundation to demonstrate the existence of a genuine issue of material fact. . . . [I]ssue-finding, rather than issue-determination, is the key to the procedure. . . . [T]he trial court does not sit as the trier of fact when ruling on a motion for summary judgment. . . . [Its] function is not to decide issues of material fact, but rather to determine whether any such issues exist." (Internal quotation marks omitted.) *Tarro* v. *Mastriani Realty, LLC*, 142 Conn. App. 419, 427, 69 A.3d 956 (2013).

"It is frequently stated in Connecticut's case law that, pursuant to Practice Book §§ 17-45 and 17-46, a party opposing a summary judgment motion must provide an evidentiary foundation to demonstrate the existence of a genuine issue of material fact. . . . [T]ypically [d]emonstrating a genuine issue requires a showing of evidentiary facts or substantial evidence outside the pleadings from which material facts alleged in the pleadings can be warrantably inferred. . . . Moreover, [t]o establish the existence of a material fact, it is not enough for the party opposing summary judgment merely to assert the existence of a disputed issue. . . . Such assertions are insufficient regardless of whether they are contained in a complaint or a brief. . . . Further, unadmitted allegations in the pleadings do not constitute proof of the existence of a genuine issue as to any material fact. . . . Mere statements of legal conclusions . . . and bald assertions, without more, are insufficient to raise

a genuine issue of material fact capable of defeating summary judgment." (Citation omitted; internal quotation marks omitted.) *Martin* v. *Westport*, 108 Conn. App. 710, 721–22, 950 A.2d 19 (2008).

It is axiomatic that causes of action sounding in negligence or breach of a fiduciary duty require the existence of a duty owed by one party to another. See *Biller Associates* v. *Peterken*, 269 Conn. 716, 723, 849 A.2d 847 (2004) ("[a] fiduciary or confidential relationship is characterized by a unique degree of trust and confidence between the parties, one of whom has superior knowledge, skill or expertise *and is under a duty* to represent the interests of the other" [emphasis in original; internal quotation marks omitted]); see also *Sic* v. *Nunan*, 307 Conn. 399, 406, 54 A.3d 553 (2012) ("[t]he essential elements of a cause of action in negligence are well established: duty; breach of that duty; causation; and actual injury" [internal quotation marks omitted]). "Contained within the . . . element [of] duty, there are two distinct considerations. . . . First, it is necessary to determine the existence of a duty, and then, if one is found, it is necessary to evaluate the scope of that duty. . . . The existence of a duty is a question of law and only if such a duty is found to exist does the trier of fact then determine whether the defendant violated that duty in the particular situation at hand. . . .

"Duty is a legal conclusion about relationships between individuals, made after the fact . . . . The nature of the duty, and the specific persons to whom it is owed, are determined by the circumstances surrounding the conduct of the individual. . . . Although it has been said that no universal test for [duty] ever has been formulated . . . our threshold inquiry has always been whether the specific harm alleged by the plaintiff was foreseeable to the defendant. The ultimate test of the existence of the duty to use care is found

in the foreseeability that harm may result if it is not exercised. . . . [T]he test for the existence of a legal duty entails (1) a determination of whether an ordinary person in the defendant's position, knowing what the defendant knew or should have known, would anticipate that harm of the general nature of that suffered was likely to result, and (2) a determination, on the basis of a public policy analysis, of whether the defendant's responsibility for its negligent conduct should extend to the particular consequences or particular plaintiff in the case." (Citation omitted; internal quotation marks omitted.) *Sic* v. *Nunan*, supra, 307 Conn. 406–408.

The crux of the present appeal is whether the defendants owed a duty to the plaintiff. The dispositive question, therefore, is whether the specific harm alleged by the plaintiff was foreseeable to the defendants. The first inquiry in the two-pronged test for the existence of a legal duty requires determining whether an ordinary person in the defendants' positions, knowing what the defendants knew or should have known, would anticipate that harm of the general nature of that suffered was likely to result. In this case, that inquiry is whether St. Peter's and the diocese knew or should have known that Jacques had or would abuse the plaintiff.

The plaintiff argues that the foreseeability of the harm to the plaintiff is evidenced by the church's policies with regard to the welfare of its members. Specifically, the plaintiff directs this court to the averments of the three aforementioned bishops, which provided that those policies were implemented to ensure that clergy would not pose a threat of any kind to members of the church. The plaintiff argues that the fact that the church had, as Douglas averred, "strong policies in place that prohibited members of the clergy from engaging in any form of abuse of others, including but not limited to sexual abuse of members of the [c]hurch," creates an issue of material fact as to the extent of the church's

knowledge of the possibility that harm would be caused by members of the clergy. He argues, "[i]f it is foreseeably necessary to have in place a policy to prohibit members of the clergy from engaging in sexual abuse of members of the church, it is foreseeable that such might occur in the absence of supervision." More broadly, he argues that it is foreseeable that some adults will abuse some children, and that therefore it was foreseeable that Jacques would abuse the plaintiff. In short, the plaintiff asks this court to adopt a literal foreseeability test, the result of which would be strict liability for harms occurring in situations where adults are supervising children.

As our Supreme Court has noted, "virtually all harms, in hindsight, are literally foreseeable." (Internal quotation marks omitted.) *Lodge* v. *Arett Sales Corp.*, 246 Conn. 563, 575, 717 A.2d 215 (1998). For this reason, our Supreme Court has rejected a literal foreseeability test. See id., 576–77 ("[T]he conclusion that a particular injury to a particular plaintiff or class of plaintiffs possibly is foreseeable does not, in itself, create a duty of care. . . . Many harms are quite literally foreseeable . . . [but] liability attaches only for *reasonably* foreseeable consequences." [Citations omitted; emphasis in original; internal quotation marks omitted.]). Thus, without any evidence indicating that it was reasonably foreseeable that Jacques would cause the type of harm that the church's policies sought to prevent, the plaintiff's argument that the church's policies created a duty owed to him by the defendants must fail.

The plaintiff did not submit any evidence to controvert the uncontested evidence provided by the defendants that no one who knew Jacques saw, heard or observed anything that alerted them that Jacques would harm anyone in any manner. Further, the plaintiff averred that he did not think that anyone at St. Peter's was aware of the incident and that he did not disclose

to anyone that the incident occurred until decades later. Without any specific facts that reasonably could give rise to an inference that the sexual abuse of the plaintiff was the foreseeable result of any act or omission by the defendants, the plaintiff's allegation that the defendants knew or should have known that Jacques had or would harm the plaintiff is unsupported. Thus, it cannot survive a motion for summary judgment. See *Nutt* v. *Norwich Roman Catholic Diocese*, 56 F. Supp. 2d 195, 201 (D. Conn. 1999); *Martinelli* v. *Bridgeport Roman Catholic Diocesan Corp.*, 989 F. Supp. 110, 120 (D. Conn. 1997). We therefore conclude that the harm that Jacques inflicted on the plaintiff was not foreseeable and, accordingly, that the court correctly determined that there was no genuine issue of material fact as to whether the defendants owed the plaintiff a legal duty.[7]

The judgment is affirmed.

In this opinion the other judges concurred.

---

[7] Because we determine that there is no legal duty based on our conclusion that the harm was not reasonably foreseeable, it is not necessary to analyze the second prong of the test by undertaking a public policy analysis. See *Monk* v. *Temple George Associates, LLC*, 273 Conn. 108, 114–15, 869 A.2d 179 (2005).