Frank MARTINELLI, Plaintiff–Appellee,

v.

**BRIDGEPORT ROMAN CATHOLIC DIOCESAN CORPORATION, Defendant–Appellant.**

**Docket No. 98–7876.**

United States Court of Appeals, Second Circuit.

Argued April 1, 1999.

Decided Nov. 10, 1999.

William M. Laviano, Ridgefield, Connecticut (Donna L. Laviano, Jennifer D. Laviano, Norman J. Voog, Laviano Law Offices P.C., Ridgefield, Connecticut, of Counsel), for Plaintiff–Appellee.

Gary P. Naftalis, New York, New York (Jonathan M. Wagner, Justine A. Harris, Kramer, Levin, Naftalis & Frankel, New York, New York, Matthew G. Conway, Danaher, Tedford, Lagnese & Neal, P.C., Hartford, Connecticut, Joseph T. Sweeney, Halloran & Sage LLP, Hartford, Connecticut, of Counsel), for Defendant–Appellant.

Michael L. Costello, Tobin and Dempf, Albany, New York; Mark E. Chopko, Jeffrey Hunter Moon, Washington, D.C. (on the brief), for amici curiae United States Catholic Conference, the Church of Jesus Christ of Latter–Day Saints, the Rev. Clifton Kirkpatrick as Stated Clerk of the General Assembly of the Presbyterian Church (U.S.A.), the General Conference of Seventh–Day Adventists, the General Council on Finance and Administration of the United Methodist Church, the First Church of Christ, Scientist, and the Evangelical Lutheran Church in America.

Before: LEVAL and SACK, Circuit Judges, and MORAN, District Judge.*

SACK, Circuit Judge:

The Bridgeport Roman Catholic Diocesan Corporation (the "Diocese") appeals from the second amended judgment of the United States District Court for the District of Connecticut (Janet Bond Arterton, *Judge*) entered on June 11, 1998 in favor of the plaintiff Frank Martinelli following a jury verdict. The jury found the Diocese liable for breaching fiduciary duties it owed to Martinelli, a parishioner, who claimed that as a teenager he had been sexually assaulted on three occasions between 1961 and 1963 by Father Laurence Brett, one of the Diocese's priests. The jury awarded Martinelli $750,000 in compensatory damages and held the Diocese liable for punitive damages. The district court subsequently fixed Martinelli's punitive damages in the amount of $250,000, and denied the Diocese's Fed.R.Civ.P. 50(b) renewed motion for judgment as a matter of law.

We affirm the district court's ruling denying the Diocese's motion for judgment as a matter of law under Rule 50(b). We conclude, however, that the district court erred in two respects in instructing the jury on the Connecticut fraudulent concealment tolling statute, Conn. Gen.Stat. § 52–595, which the plaintiff invoked to proceed with his otherwise untimely claim. First, the district court erred by failing to instruct the jury that the plaintiff had the burden to prove that he lacked knowledge of the existence of his cause of action during the time he claimed that it was fraudulently concealed from him. Second, the district court erroneously instructed the jury that the tolling statute did not require that the defendant have actual awareness of facts necessary to establish the plaintiff's cause of action if the defendant's lack of awareness resulted from a breach of fiduciary duties it owed to the plaintiff. We therefore vacate the judgment and remand for a new trial on at least the issues of (1) whether Martinelli, in invoking the tolling statute, has met his burden of proof as to his own lack of knowledge; and (2) whether the Diocese has demonstrated that it lacked knowledge of the plaintiff's cause of action such that the tolling statute does not apply.

## BACKGROUND

In June 1962, Father Laurence Brett began his Catholic priesthood as assistant

---

* The Honorable James B. Moran, Senior United States District Judge for the Northern District of Illinois, sitting by designation.

to the pastor at St. Cecilia's Parish in Stamford, Connecticut, a church operating within the Bridgeport Diocese. Martinelli, then a fourteen-year-old student at Stamford Catholic High School, a school affiliated with the Bridgeport Diocese, was a parishioner at St. Cecilia's.

During Father Brett's tenure at St. Cecilia's, which lasted a little more than two years, he acted as a mentor and spiritual advisor to a small group of boys, including Martinelli, who were interested in liturgical reforms in the Catholic Church. Brett referred to the group as "Brett's Mavericks." [1]

Martinelli claims that Father Brett abused his position of trust and induced members of the group to engage in sexual relations with him. Martinelli testified to three occasions on which Brett sexually assaulted him as a minor. On the first, Brett performed fellatio on Martinelli in a walkway behind the grade school of the church after confession. On the second, Brett induced Martinelli to perform fellatio on him in Brett's car in St. Cecilia's parking lot by telling him that the act was a way to receive Holy Communion. The third incident of abuse allegedly occurred when Brett fondled Martinelli in a bathroom during a field trip the two made with another boy to Baltimore and Washington, D.C. Although Martinelli's recollection of the dates of these alleged incidents is not clear, he testified that they occurred sometime in 1962, 1963, or 1964. He further claims that his memory of the abuse he suffered was repressed and not recovered until after a conversation with a high-school friend in October 1991 and during subsequent therapy.

In September 1964, Father Brett left St. Cecilia's in Stamford to become a spiritual director at Sacred Heart University in nearby Bridgeport. On December 1 of that year, the Diocese received a complaint that Brett had sexually assaulted a 19–year-old Sacred Heart University student, "T.F.," the month before. A December 2, 1964 report of the incident prepared by Monsignor William A. Genuario, the Diocese's Vice Chancellor, indicated that Diocesan officials confronted Brett the day the complaint was lodged and that Brett admitted the truth of the student's allegations. The report added that the complaining student, "T.F.," "was worried about other boys who had gone to [a] New York Hotel with Father Brett" but that "Father Brett denies that anything happened on those occasions." The report also indicated, however, that Brett "admitted ... involvement with one other University boy," or perhaps, as Msgr. McGough, a second Diocesan official present at the meeting with Brett, recalled the conversation, "one or two other [boys] on one or two occasions." According to the Diocese's report, Brett stated that he "discovered his problem in Stamford, and had been involved there," and that his "problem" was known to a small number of people, including Brett's Stamford pastor, Father Stephen, to whom "[s]omeone from Stamford [had] reported an incident." The report concluded that the Diocese would relieve Father Brett of his local duties and that "[a] recurrence of hepatitis [for which Brett had been hospitalized in early 1964] was to be feigned should anyone ask."

Shortly thereafter, Father Brett was sent to New Mexico for several months' psychiatric treatment. Although the Diocese refused Brett's requests to resume his work as a priest in Connecticut, it continued to provide him with financial support. Brett served briefly as a parish priest in New Mexico, spent time in California, and eventually relocated to Maryland where, in addition to ecclesiastical

---

1. "Bret Maverick" (played by Jack Kelly), and his brother "Bart" (James Garner), were characters in a popular ABC television comedy-Western series that originally aired between 1957 and 1962. *See* Alan Morton,

*Maverick: An Episode Guide,* www.xnet.com/djk/Maverick_2.shtml (1999). A motion picture based on the television series was released in 1994. *See id.*

appointments that included a summer position at the Parish of St. Patrick, Cumberland, and a stint as Chaplain at Calvert Hall College, Baltimore, he developed a career as a writer and editor.

In January 1966, while Father Brett was still in New Mexico, the Bridgeport Diocese learned of another allegation of Brett's misconduct that was said to have occurred in Connecticut prior to the "T.F." episode and Brett's transfer from St. Cecilia's. It involved a teenage boy identified as "M.F." In a letter written in April 1966 on the matter to the Apostolic Delegate to the United States, Bishop Walter W. Curtis explained that in late 1963 Brett had allegedly "said something which the boy interpreted as a solicitation to homosexual misconduct." "M.F.," whom plaintiff Martinelli has identified as one of "Brett's Mavericks," reportedly declined Brett's solicitation and terminated his relationship with the priest. The bishop goes on to state that

["M.F."] probably became aware of Father Brett's disappearance from the diocese because the high school is close to the university. However, I doubt that he knew the precise reason since the incident involving the university student did not become known, and the departure of Father Brett was accomplished very quietly.

By way of response to the letter, the Apostolic Delegate suggested that Bishop Curtis meet with "M.F." 's parents because "[s]uch an expression of pastoral concern may relieve them while an official attitude may leave them bitter." A May 1, 1967 memorandum prepared by Bishop Curtis after his meeting with the boy's parents reports that they believed that "the Church bears great responsibility in this whole matter toward their son ... and they expect that help will be given.... Both parents judge that the Church or someone in the Church was at fault in advising the boy not to report this incident, when it happened, to [his parents]."

Bishop Curtis apparently disagreed with this assessment, however, writing that

the boy himself ... said that he could not bring himself to tell [his parents] and I tried to indicate that this might have been the reason why the advice was given not to tell them, mainly that the boy did not feel up to it and it was judged there was no obligation under the circumstances to do so.

Accordingly, Bishop Curtis "made it clear" to the parents that the Diocese could not accept responsibility for Father Brett's conduct or for "the financial state of this young man for the rest of his life." But Bishop Curtis agreed that a Father Vaughan would remain in contact with the family and that the Diocese would consider providing whatever assistance he suggested was appropriate.

Martinelli claims that he had no recollection of the abuse he suffered from Father Brett until a conversation with a childhood friend in October 1991 sparked his memory of the events. Martinelli testified that as a result of the alleged abuse he has experienced long-term emotional difficulties, including depression, relationship difficulties, work problems, and a loss of religious faith, requiring ongoing counseling and psychotherapy. According to Martinelli, his therapy proved more successful once he discovered that he had been assaulted as a teenager.

In December 1992 or January 1993, Martinelli, through his lawyer, informed the Diocese of his allegations against Brett. In February, Diocese officials met with Brett, who, at the request of the Diocese, signed a petition for laicization, terminating his status as a priest under the auspices of the Bridgeport Diocese. In June 1993, the Diocese wrote the Archdiocese of Baltimore, informing it that Brett no longer had the faculties of the Bridgeport Diocese. In August of that year, the Archdiocese of Baltimore informed Brett that, as a result, he was not to function as a priest under its auspices either. Having consulted with his own

attorney, however, Brett wrote the Bridgeport Diocese to withdraw the petition for laicization. At the time of trial in 1997, he remained a priest incardinated to the Bridgeport Diocese, although there is no indication in the record what his activities then were.

Martinelli, now a Wisconsin resident, filed the present diversity action against the Bridgeport Diocese and Father Brett on July 27, 1993 seeking damages on seven counts: (1) intentional infliction of emotional distress by both defendants; (2) assault and battery by Brett; (3) breach of fiduciary duty by both defendants for failure to disclose the sexual abuse; (4) negligent infliction of emotional distress by both defendants; (5) negligent retention of Brett by the Diocese; (6) vicarious liability of the Diocese for Brett's misconduct; and (7) negligent training and supervision by the Diocese.

Brett could not be located by Martinelli's counsel for the purpose of serving him with a summons and he did not file an answer or otherwise appear in this case.

In August 1996, the Diocese moved for summary judgment, which the district court granted in part and denied in part in a thorough and thoughtful opinion dated March 24, 1997. *Martinelli v. Bridgeport Roman Catholic Diocesan Corp.*, 989 F.Supp. 110 (D.Conn.1997) (*"Martinelli I"*). In its summary judgment motion papers, the Diocese argued that all of Martinelli's claims, brought almost 30 years after the alleged assaults occurred, were barred by the applicable Connecticut statute of limitations, which required Martinelli to bring his claim within 17 years after reaching the age of majority. *See* Conn. Gen.Stat. § 52–577d. The district court disagreed, concluding that a jury could find the statute of limitations tolled because there was evidence that the Diocese

had fraudulently concealed from Martinelli the existence of his claims. *See Martinelli I*, 989 F.Supp. at 114–17 (citing Conn. Gen. Stat. § 52–595). In reaching that conclusion, the district court said, "The most difficult issue … pertains to the Diocese's actual knowledge of plaintiff's cause of action." *Martinelli I*, 989 F.Supp. at 115. It noted that "the name 'Frank Martinelli' appeared nowhere in the Diocese's voluminous file on Father Brett prior to the initiation of the present lawsuit," and that "[p]laintiff offers no evidence to suggest that the Diocese was aware [prior to this action] of the facts upon which the present cause of action is based." *Id.* at 116. The court nonetheless held that Martinelli "may demonstrate § 52–595 [the tolling statute] to be applicable notwithstanding the Diocese's ignorance of his cause of action if plaintiff can show that the Diocese's ignorance was the result of a violation of a legal duty to plaintiff to investigate and warn." *Id.* In other words, the district court took the view that even if the Diocese did not know that Martinelli was a victim of abuse, it could not avoid the tolling statute if its ignorance resulted from the breach of a fiduciary duty the Diocese owed to Martinelli that gave rise to a duty to investigate and warn or inform.

As a result of the summary judgment ruling, a separate voluntary withdrawal, and a pre-verdict motion for judgment as a matter of law, the case went to trial in August 1997 on just two of Martinelli's claims against the Diocese: breach of fiduciary duty[2] and negligent infliction of emotional distress. In the district court's instructions to the jury, in accordance with its ruling on the Diocese's motion for summary judgment, the court said:

> Mr. Martinelli need not prove that the Diocese had actual knowledge of the alleged incidents of his own individual

**2.** The issues on this appeal are complicated by the fact that the plaintiff's claim of the Diocese's breach of fiduciary duty has a double role: first, in determining whether the statute of limitations was tolled by the Dio-

cese's alleged fraudulent concealment from Martinelli of his claim against the Diocese, and second, as a substantive basis on which Martinelli claims the diocese is liable to him for the injury of which he complains.

abuse if you find that the defendant Diocese breached a fiduciary duty to undertake additional investigation of Father Brett's alleged sexual misconduct that would have revealed Mr. Martinelli as a victim.

The court further instructed the jury that if Martinelli were to demonstrate that a fiduciary relationship existed between him and the Diocese the burden would shift to the Diocese to prove that it did not breach its fiduciary duty by intentionally concealing Martinelli's cause of action for the purpose of delaying his lawsuit. Otherwise, the statute of limitations would be tolled. The court also instructed the jury that while a plaintiff claiming fraudulent concealment normally needs to demonstrate his or her own lack of knowledge of the cause of action, if the Diocese owed Martinelli a fiduciary duty it also carried the burden to demonstrate that Martinelli knew about his cause of action in order to avoid application of the tolling provision on that basis. The court charged:

> If you find that a fiduciary relationship existed between the defendant Diocese and the plaintiff, Frank Martinelli, and if you find that the defendant Diocese violated its duties in that relationship, then you must decide whether the defendant Diocese has met its burden of disproving ... at least one of the elements of fraudulent concealment by clear and convincing evidence.... These elements are as follows:
>
> 1) That the plaintiff, Frank Martinelli, was not aware of the essential alleged factual elements of his cause of action for breach of fiduciary duty and negligent infliction of emotional distress prior to July 27, 1990;
>
> 2) That the defendant intentionally concealed from the plaintiff facts necessary for the plaintiff to know that he had a cause of action against the Diocese, i.e. that he had a legally actionable injury; and
>
> 3) That the defendant concealed those facts for the purpose of obtaining de-

lay on the plaintiff's part in filing a lawsuit on his cause of action.

By special verdict, the jury found that Martinelli had demonstrated that there existed a fiduciary relationship between him and the Diocese. The jury also found that the Diocese had failed to demonstrate by clear and convincing evidence that Martinelli was aware of his own cause of action or that the Diocese had not concealed the action from Martinelli for the purpose of delay. The statute of limitations was therefore tolled and the action timely.

As to the merits of the action, the jury rejected Martinelli's claim for negligent infliction of emotional distress, but found the Diocese liable for breach of its fiduciary duties. The jury awarded Martinelli compensatory damages of $750,000 and imposed punitive damages to be set by the court at a later date.

After trial, the Diocese renewed its motion for judgment as a matter of law pursuant to Fed.R.Civ.P. 50(b). The Diocese argued principally that Martinelli's claim was time-barred, that there was insufficient evidence to support the finding of a fiduciary relationship between the Diocese and Martinelli, and that the First Amendment precluded reliance on religious doctrine to support such a finding. The district court denied the motion in a ruling dated March 31, 1998. *Martinelli v. Bridgeport Roman Catholic Diocesan Corp.*, 10 F.Supp.2d 138 (D.Conn.1998).

On June 5, 1998, the district court entered the order awarding Martinelli $250,-000 in punitive damages. Final judgment was entered on June 11, 1998.

The Diocese now appeals from the final judgment and from the denial of its Rule 50(b) motion. It argues principally that: (1) the district court erred in its application of the tolling statute, particularly with respect to its jury instructions on the allocation of the burden of proof as to fraudulent concealment and a fiduciary's knowledge of the cause of action, and that because the tolling statute does not apply

Martinelli's claims are time-barred as a matter of law; (2) there was insufficient evidence to support a finding of a fiduciary relationship between the Diocese and Martinelli and the lower court's reliance on religious teachings to support such a finding violated the First Amendment; and (3) the district court committed reversible error by instructing the jury that it could draw a negative inference from the Diocese's failure to produce Father Brett as a witness at trial. We disagree with these arguments save for two aspects of the first.

We agree with the Diocese that the district court erred by charging the jury that the Diocese had to prove that Martinelli possessed knowledge of the existence of his cause of action if the Diocese was to avoid application of the fraudulent concealment tolling statute on that basis. We agree with the district court that Connecticut law requires a defendant owing fiduciary duties to the plaintiff to prove under the tolling statute that it did not fraudulently conceal the plaintiff's cause of action. However, in order to invoke the tolling statute, it is the plaintiff who must demonstrate that he or she was ignorant of the existence of his or her cause of action. Martinelli must therefore carry the burden of proof in establishing that he was unaware of the existence of his claim against the Diocese until at least July 27, 1990, three years (the limitation period) or less before he brought suit.

We also agree with the Diocese that the district court erred by instructing the jury that under the fraudulent concealment tolling statute, the limitation period would be tolled, notwithstanding the Diocese's ignorance of the plaintiff's claim, if the Diocese's ignorance resulted from a breach of its fiduciary duties to the plaintiff. The Diocese's knowledge of Martinelli's cause of action remained an element of fraudulent concealment under the tolling statute even if the Diocese owed fiduciary duties to Martinelli. The jury should have considered this element. We disagree, how-

ever, with the Diocese's related claim that it was entitled to judgment as a matter of law because there was no evidence that it knew that Martinelli, specifically, had been molested. No such showing was required.

We therefore affirm the district court's ruling denying the Diocese's Rule 50(b) motion. In light of the two erroneous jury instructions, however, we vacate the judgment and remand for a new trial on at least the issues of (1) whether Martinelli has met his burden of proof as to his own lack of knowledge in order to invoke the fraudulent concealment tolling statute, and (2) whether the Diocese has demonstrated that it lacked knowledge of the plaintiff's cause of action, so as to prevent application of the tolling statute.

## DISCUSSION

### I. Statute of Limitations

*A. Generally*

Breach of fiduciary duty claims in Connecticut are ordinarily subject to a three-year statute of limitations under Conn. Gen.Stat. § 52–577. However, a different statute of limitations applies to Connecticut cases of alleged sexual abuse such as Martinelli's.

> [N]o action to recover damages for personal injury to a minor, including emotional distress, caused by sexual abuse, sexual exploitation or sexual assault may be brought by such person later than seventeen years from the date such person attains the age of majority.

Conn. Gen.Stat. § 52–577d. As the district court observed in its opinion denying the Diocese's Rule 50(b) renewed motion for judgment as a matter of law, until October 1972 the age of majority in Connecticut was twenty-one. *See* Conn. Gen. Stat. § 1–1d. Accordingly, Martinelli, who turned twenty-one on August 3, 1968, had until 1985 to bring this action; filed in July 1993, it was therefore eight years out of time unless the running of the limitations

period was somehow suspended under Connecticut law.

■ The provision of Connecticut law that Martinelli asserts tolled the statute of limitations applicable to his claims is Connecticut Gen.Stat. § 52–595, which may relieve a plaintiff from operation of the statute of limitations for a claim that has been fraudulently concealed from him by the person against whom the claim is to be made. It reads:

If any person, liable to an action by another, fraudulently conceals from him the existence of the cause of such action, such cause of action shall be deemed to accrue against such person so liable therefor at the time when the person entitled to sue thereon first discovers its existence.

Because this statute "constitutes a clear and unambiguous general exception to any statute of limitations that does not specifically preclude its application," *Connell v. Colwell*, 214 Conn. 242, 246 n. 4, 571 A.2d 116, 118 n. 4 (1990), it applies to claims governed by § 52–577d, the sexual assault statute of limitations.[3]

Once a tolling period has ended because of the plaintiff's discovery of his or her cause of action, the statute of limitations begins to run again. The district court instructed the jury that if the statute of limitations as to Martinelli's claims had been tolled by reason of the Diocese's fraudulent concealment, he had three years after his discovery of the facts underlying those claims to assert them in a lawsuit against the Diocese.[4]

In arguing on appeal that § 52–595 does not save Martinelli's long-delayed claims, the Diocese directs our attention principally to *Bartone v. Robert L. Day Co.*, 232 Conn. 527, 656 A.2d 221 (1995). In *Bartone*, the Connecticut Supreme Court held that in order to benefit from the § 52–595 tolling provision, a plaintiff must demonstrate:

(1) a defendant's actual awareness, rather than imputed knowledge, of the facts necessary to establish the plaintiffs' cause of action; (2) that [sic] defendant's intentional concealment of these facts from the plaintiffs; and (3) that [sic] defendant's concealment of the facts for the purpose of obtaining delay on the plaintiffs' part in filing a complaint on their cause of action.

*Id.* at 225 (citations omitted); *see also Lippitt v. Ashley*, 89 Conn. 451, 480, 94 A. 995, 1005 (1915) (actions of the defendant must be "directed to the very point of obtaining the delay, of which he afterwards seeks to take advantage by pleading the statute"). The *Bartone* court further held that a plaintiff seeking tolling under § 52–595 must demonstrate these elements by "clear, precise, and unequivocal evidence." 656 A.2d at 224.

### B. Jury Instructions on the Burden of Proof.

■ The Diocese argues that the district court erred in instructing the jury that the burden of proof as to fraudulent concealment under § 52–595 shifts to the

---

**3.** The dissent suggests that because "[t]he Connecticut legislature gave victims an extraordinary 17 year period after the age of majority in which to bring claims regarding sexual abuse," dissent, *post* at [ —— ], we should be wary of concluding that Martinelli's time to bring suit was further extended by § 52–595. It seems to us that tolling has, if anything, a *greater* impact on brief limitations periods where the legislature has determined that the plaintiff ordinarily must bring his or her action shortly after the events in issue have occurred than it does on long ones, such as that applicable here, where the legislature is content that many years may pass before

litigation is begun and prosecuted. Be that as it may, § 52–595 by its terms applies to long and short limitations periods alike.

**4.** The court employed a three-year limitations period from the date of the plaintiff's discovery of the basis for his alleged causes of action. It is not clear whether the court adopted that period from the general breach of fiduciary duty statute of limitations, Conn. Gen.Stat. § 52–577, or elsewhere, but neither Martinelli nor the Diocese has challenged the court's ruling.

defendant upon a finding that it is a fiduciary with respect to the plaintiff.[5] Our review of the instructions the district court gave the jury is governed by a well-established standard:

> A jury charge is erroneous if it misleads the jury as to the correct legal standard, or if it does not adequately inform the jury of the law. A court's charge must be tested by viewing it as a whole and will not be disturbed if it is correct and sufficiently covers the case so that a jury can intelligently determine the questions presented to it. An erroneous instruction, unless harmless, requires a new trial.

*Pahuta v. Massey–Ferguson, Inc.,* 170 F.3d 125, 135 (2d Cir.1999) (quotations and citation omitted).

■ To be sure, under Connecticut law, in the ordinary case in which fraudulent concealment is asserted by a party attempting to extend the statute of limitations, the plaintiff is required to shoulder the burden with respect to all three parts of the *Bartone* test: [1] the defendant's actual, not imputed, awareness of the facts necessary to establish the plaintiff's cause of action; [2] its intentional concealment of such facts; and [3] that the concealment is for the purpose of obtaining delay. But when a defendant is sued by a person to whom it owes a fiduciary duty and that person is trying to extend the limitations period, Connecticut law requires that the burden shift to the defendant to prove that one of the three *Bartone* elements has not been met. The district court therefore did not err in allocating to the Diocese the burden of proof as to the *Bartone* elements.

We agree with the Diocese, however, that a plaintiff who invokes the tolling statute, even a plaintiff to whom the defendant owes fiduciary duties, carries the burden of proof on the question of the plaintiff's *own* ignorance of the existence of the cause of action. That burden does not shift to the defendant. The district court therefore erred in requiring the Diocese to prove that Martinelli was unaware of the existence of his claim. *See infra* Section I.F.

## C. Elements of Fraudulent Concealment.

■ The Connecticut Supreme Court has recently reiterated its rule that where an allegation of fraud, self-dealing, or conflict of interest is made against a fiduciary, the burden shifts to the fiduciary to prove that it acted fairly:

> Our law on the obligations of a fiduciary is well settled. A fiduciary or confidential relationship is characterized by a unique degree of trust and confidence between the parties, one of whom has superior knowledge, skill or expertise and is under a duty to represent the interests of the other. The superior position of the fiduciary or dominant party affords him great opportunity for abuse of the confidence reposed in him. Once a fiduciary relationship is found to exist, the burden of proving fair dealing properly shifts to the fiduciary. Furthermore, the standard of proof for establishing fair dealing is not the ordinary standard of fair preponderance of the evidence, but requires proof either by clear and convincing evidence, clear and satisfactory evidence or clear, convincing and unequivocal evidence. Proof of a fiduciary relationship, therefore, generally imposes a twofold burden on the fiduciary. First, the burden of proof shifts to the fiduciary; and second, the

---

5. It is unclear from the record whether the defendant objected to, failed to object to, or agreed with the district court's jury instructions as to who had the burden of proof on the second and third *Bartone* factors. Inasmuch as we agree with these portions of the district court's charge in any event and a discussion of our reasoning will help explain our views on the portions of the charge with which we disagree, we assume for purposes of this discussion that the Diocese's objection to these instructions was preserved. Were we to hold that the objections were forfeited or waived, the result would be the same.

standard of proof is clear and convincing evidence.

*Murphy v. Wakelee,* 247 Conn. 396, 400, 721 A.2d 1181, 1183–84 (1998) (citation and quotation marks omitted).

■ At issue in *Murphy* was whether a claim against a fiduciary based on negligence shifts the burden of proof to the fiduciary. The court held that it did not. "[I]n the absence of a claim of fraud, self-dealing or conflict of interest, the trial court was not required to charge the jury that the defendant had a duty to prove his fair dealing by clear and convincing evidence." *Id.* 721 A.2d at 1183 (footnotes omitted). But the court took the occasion to spell out why the burden of proof does shift to the fiduciary when fraud is alleged. When a fiduciary, who has superior knowledge and influence and who is accorded a significant measure of trust, benefits in its dealings with those to whom it owes duties of care and candor, a suspicion naturally arises that the fiduciary has gained by taking advantage of its special relationship.[6] The fiduciary is required to explain itself, to prove fair dealing and thus to dispel the suspicion. "The full knowledge of the transaction is within his possession; he can and he must assume the burden of its proof." *Id.* at 1184 (quoting *Jordan v. Jordan Co.,* 94 Conn. 384, 390, 109 A. 181, 184 (1920)).

Shifting the burden of proof protects fiduciary relationships by helping to en-sure that the fiduciary acts consistently with the responsibilities such relationships entail. "[A]ny one acting in a fiduciary relation shall not be permitted to make use of that relation to benefit his own personal interest. This rule is strict in its requirements and in its operation. It extends to all transactions where the individual's personal interests may be brought into conflict with his acts in the fiduciary capacity...." · *Id.* 721 A.2d at 1184 (quoting *State v. Culhane,* 78 Conn. 622, 629, 63 A. 636, 638 (1906) (internal quotation marks and citation omitted)).

■ To be sure, where the fiduciary has not received some kind of benefit that would engender suspicion and there is no other evidence of wrongdoing, the burden of proof remains on the plaintiff. *See id.* 721 A.2d at 1183 (no shift in burden of proof where sole claim ·is fiduciary's negligence in failing to preserve ward's assets and no allegation of fraud or a conflict of interest). But Connecticut law routinely shifts the burden of proof, irrespective of circumstances, where a fiduciary appears to have obtained a benefit at the expense of a person to whom it owes a fiduciary duty. *See, e.g., Konover Development Corp. v. Zeller,* 228 Conn. 206, 635 A.2d 798 (1994) (general partner who terminates agreement with limited partner on ground that project is no longer feasible has burden to show fair dealing); *Dunham v. Dunham,* 204 Conn. 303, 528 A.2d 1123

---

**6.** Although not always expressly stated, the basis upon which the aforementioned burden-shifting and enhanced burden of proof rests is, essentially, that undue influence will not be presumed; *Connell v. Colwell,* 214 Conn. 242, 252, 571 A.2d 116 (1990) (fraud is not presumed and burden of establishing fraud rests on party who alleges it); and that the presumption of fraud does not arise from the relationship itself. We note, however, that this rule is somewhat relaxed in cases where a fiduciary relation exists between the parties to a transaction or contract, and where one has a dominant and controlling force or influence over the other. In such cases, if the superior party obtains a possible benefit, equity raises a presumption against the validity of the transaction or contract, and casts upon such party the burden of proving fairness, honesty, and integrity in the transaction or contract.... Therefore, it is only when the confidential relationship is shown together with suspicious circumstances, or where there is a transaction, contract, or transfer between persons in a confidential or fiduciary relationship, and where the dominant party is the beneficiary of the transaction, contract, or transfer, that the burden shifts to the fiduciary to prove fair dealing. A fiduciary seeking to profit by a transaction with the one who confided in him has the burden of showing that he has not taken advantage of his influence or knowledge and that the arrangement is fair and conscientious.

*Id.* 721 A.2d at 1186 (additional quotations, citations and alterations omitted).

(1987) (executor of will who consolidates all property in his own name and leaves brother with virtually nothing has burden to prove fair dealing); *Alaimo v. Royer*, 188 Conn. 36, 448 A.2d 207 (1982) (real estate broker has burden to prove fair dealing where elderly disabled woman gives broker life savings for purposes of investment and broker instead spends money).

A fiduciary obtains an obvious benefit if the person to whom it owes a fiduciary duty delays bringing a cause of action against the fiduciary beyond the expiration of the statute of limitations: The claim against the fiduciary is forever barred. The benefit the fiduciary derives comes at the expense of the very party who has placed trust in the fiduciary and expects fair dealing. In this situation as in others involving a fiduciary's duty of fair dealing, we agree with the district court that Connecticut law requires the fiduciary to show that it has not abused its position of trust, knowledge and influence by concealing the claim from the would-be plaintiff. Indeed, the possible concealment of a fiduciary's own wrongdoing egregious enough to give rise to a legal claim seems particularly the type of behavior that the law requires the fiduciary to explain.

> [S]tatutes of limitation ... were enacted to prevent frauds; to prevent parties from asserting rights after the lapse of time had destroyed or impaired the evidence which would show that such rights never existed, or had been satisfied, transferred, or extinguished, if they ever did exist. To hold that by concealing a fraud, or by committing a fraud in a manner that it concealed itself until such time as the party committing the fraud could plead the statute of limitations to protect it, is to make the law which was designed to prevent fraud the means by which it is made successful and secure.

*Bailey v. Glover*, 21 Wall. 342, 88 U.S. 342, 349, 22 L.Ed. 636 (1874).

Although there is no Connecticut decision specifically addressing whether the usual practice of shifting the burden of proof to a fiduciary to prove it has acted fairly extends to an allegation of fraudulent concealment under the tolling statute, we think that under Connecticut law such an allocation is compelled. As the Connecticut Supreme Court observed many years ago:

> *In all cases*, where by accident, mistake, fraud or otherwise, a party has an unfair advantage in proceeding in a court of law, which must necessarily make that court an instrument of injustice, and it is, therefore, against conscience that he should use that advantage, a court of equity will interfere, and restrain him from using the advantage which he has thus improperly gained.

*Folwell v. Howell*, 117 Conn. 565, 568–69, 169 A. 199, 200 (1933) (quoting *Tucker v. Baldwin*, 13 Conn. 136, 144 (1839)(emphasis added)). We have no reason to believe that Connecticut courts would make an exception from "all cases" where, as here, a plaintiff asserts that a person with a fiduciary duty toward him has taken unfair advantage of the plaintiff to deprive him of the timely assertion of a cause of action against the fiduciary. There is nothing about this circumstance that requires a special rule to the contrary.

■ This conclusion is bolstered by our observation that under Connecticut law fraudulent concealment for purposes of the tolling statute is consistently treated as akin to other forms of fraud, with similar requirements of proof. *See, e.g., Puro v. Henry*, 188 Conn. 301, 308, 449 A.2d 176, 179 (1982) (observing, in a discussion of fraudulent concealment, the general rule that "[f]raud is not to be presumed, but must be strictly proven. The evidence must be clear, precise, and unequivocal."); *see also Bound Brook Assocs. v. City of Norwalk*, 198 Conn. 660, 664–66, 504 A.2d 1047, 1050–51 (1986); *Beckenstein v. Potter and Carrier, Inc.*, 191 Conn. 150, 162–63, 464 A.2d 18, 25 (1983); *Armellino v. Dowling*, No. CV 92–0330634, 1995 WL 317098, at *4 (Conn.Super.Ct. May 16,

1995) (treating fraudulent concealment as a form of the fraud of misrepresentation); *Krupa v. Kelley*, 5 Conn. Cir. Ct. 127, 129–30, 245 A.2d 886, 888–89 (1968). *See generally* John P. Dawson, *Fraudulent Concealment and Statutes of Limitation*, 31 Mich. L.Rev. 875, 879 (1933) ("[A]ny circumstances, such as personal inequality or 'fiduciary' or confidential relationships, which would tend to explain credulity in actions based on fraud will have the same effect in claims that were fraudulently concealed.").

In arguing that the district court erred in instructing the jury that the burden of proof shifts to a fiduciary, the Diocese emphasizes the statement in *Bartone* that it is the *"plaintiffs* [who] ha[ve] to prove fraudulent concealment by ... clear, precise, and unequivocal evidence." *Bartone*, 656 A.2d at 224 (quoting *Bound Brook Assocs.*, 504 A.2d at 1051)(emphasis added). According to the Diocese, this language establishes that the burden of proof as to all the elements of fraudulent concealment is on the plaintiff who invokes the tolling statute, and that it may not be shifted to the defendant.

We disagree. We know of no Connecticut case that holds that the burden of proof is on the plaintiff to prove fraudulent concealment if the action is brought by a person against someone with a fiduciary duty toward him or her that is related to the claim, and *Murphy* is clearly to the contrary. While *Bartone* spoke of the plaintiff's burden, that litigation, brought by a homeowner, against a building contractor and its subcontractors for the faulty installation of a septic system, did not involve a fiduciary relationship. The opinion said nothing about the allocation of the burden of proof as to fiduciaries.

We conclude that where a defendant owes a fiduciary duty to a plaintiff and the plaintiff asserts under the fraudulent concealment tolling statute that the defendant has fraudulently concealed the plaintiff's cause of action, Connecticut law requires that the defendant bear the burden of

proof as to the elements of fraudulent concealment set out in *Bartone*. If the fiduciary is to avoid the application of the tolling statute, the defendant must show that one of these elements is not met.

Finally, as in other instances in which the burden shifts to the fiduciary to show fair dealing, such proof must be by "clear and convincing evidence," *Murphy*, 721 A.2d at 1184. As we have seen, fraudulent concealment in the fiduciary context is simply one of many possible forms of unfair dealing by a fiduciary. We have no reason to think that Connecticut courts would adopt some lighter burden of proof for the fiduciary to meet here. The district court's instructions to the jury with respect to the second and third *Bartone* factors—intentional concealment by the defendant for the purpose of obtaining delay—were therefore proper.

## D. The Diocese's Knowledge

The first *Bartone* factor that must be established in order to conclude that a defendant is guilty of fraudulent concealment so as to toll the statute of limitations in a claim against it is that the defendant harbor "actual awareness, rather than imputed knowledge, of the facts necessary to establish the plaintiff's cause of action." *Bartone*, 656 A.2d at 225. In ruling on the Diocese's motion for summary judgment, the district court concluded that the Diocese did not possess the actual knowledge required under *Bartone* because there was no evidence that the Diocese knew prior to the institution of this lawsuit that Martinelli had been sexually abused. Agreeing, however, with Martinelli that "the Diocese should not be permitted to take advantage of its ignorance now when its ignorance was the result of a failure to fulfill a duty to investigate and warn," the district court decided that this first requirement of *Bartone* could be "relax[ed]." *Martinelli I*, 989 F.Supp. at 116. The court reasoned that "[a]lthough Connecticut courts do not appear to have squarely addressed this particular claim ... [there is] ample sup-

port in the case law for the proposition that a defendant may not avoid application of § 52–595 by relying on the violation of a legal duty." *Id.* The court concluded that Martinelli therefore could "demonstrate § 52–595 to be applicable notwithstanding the Diocese's ignorance of his cause of action if [he could] show that the Diocese's ignorance was the result of a violation of a legal duty to [him] to investigate and warn." *Id.* at 116. Thus the district court decided that if there is a fiduciary duty to investigate and warn, the first *Bartone* requirement relating to the defendant's actual knowledge disappears. The district court instructed the jury accordingly.

We agree with the Diocese that this was error. We are aware of no Connecticut decision that can be made to stand for such a proposition. *But see Bound Brook Assocs.,* 504 A.2d at 1052 n. 12 ("In view of our finding that [the] evidence does not establish an intent to conceal, we need not decide whether [the defendant] had a duty to investigate or to warn, or whether an intentional failure to act in such circumstances would be sufficient to establish fraudulent concealment.").

The district court, in so holding, relied on cases that address whether a defendant's silence is sufficient to constitute concealment under Connecticut's tolling statute and similar laws in other states. *See Martinelli I,* 989 F.Supp. at 116–17. Those cases indicate that silence is insufficient to meet the concealment standard absent a special duty to disclose. *See Manufacturers Hanover Trust Co. v. Stamford Hotel Ltd. Partnership,* No. CV 91 011697 IS, 1994 WL 720368, at *3–4 (Conn.Super.Ct. Dec. 15, 1994) (considering whether special circumstances giving rise to duty to disclose were present and noting that if they were defendant may have had a duty to disclose to plaintiff facts giving rise to the fraud); *Lapuk v. Simons,* No. PJR CV 93 0704542S, 1995 WL 5633, at *16 (Conn.Super.Ct. Jan. 3, 1995) (acknowledging that Connecticut courts have found that silence may consti-

tute an act of concealment despite the fact that the courts have also held that the concealment must be for the purpose of delaying the onset of a lawsuit); *A.M. v. Roman Catholic Church,* 669 N.E.2d 1034, 1038 (Ind.Ct.App.1996) (under Indiana law, equitable tolling on grounds of fraudulent concealment can arise either from an active effort to conceal a cause of action or from the violation of a fiduciary or confidential relationship, described as constructive fraud); *Koenig v. Lambert,* 527 N.W.2d 903, 905 (S.D.1995), *overruled on other grounds, Stratmeyer v. Stratmeyer,* 567 N.W.2d 220 (S.D.1997) (in South Dakota silence by party with duty to disclose constitutes fraudulent concealment without need to show any affirmative attempt to hide facts from plaintiff); *see also Hamilton v. Smith,* 773 F.2d 461, 468 (2d Cir. 1985) ("To establish fraudulent concealment under Connecticut law, a plaintiff must show that ... *absent a fiduciary relationship,* the defendant was guilty of some affirmative act of concealment.") (emphasis added) (citations omitted). Whether a defendant's silence in the face of a duty to speak constitutes an affirmative act of concealment is relevant to the second *Bartone* factor, the defendant's intentional concealment, but has no bearing on the first with which we are now concerned, the defendant's actual awareness of the facts necessary to establish the plaintiffs' cause of action. We do not agree with the district court that the cited cases justify the elimination of the need to establish the first *Bartone* requirement.

The first *Bartone* factor reflects a policy judgment by the Supreme Court of Connecticut that a defendant should not be subjected to the tolling provided by § 52–595 unless it had actual knowledge of significant facts that it concealed from the plaintiff; knowledge imputed to it by law is not enough. *Murphy* requires that where the defendant owes the plaintiff a fiduciary duty, it is the defendant that must prove the absence of such actual knowledge. Irrespective of who must

prove it, though, the defendant's actual knowledge remains necessary in order to establish fraudulent concealment. We therefore agree with the Diocese that the court erred in dispensing with the first *Bartone* factor.

### E. Facts Necessary To Establish the Cause of Action

The Diocese argues that since, as we hold, the first *Bartone* factor was improperly eliminated from the case by the district court, it is entitled to judgment as a matter of law: There was no evidence that the Diocese knew that Martinelli had been injured and it therefore could not have been found to have, as the first *Bartone* factor requires, "actual awareness . . . of *the facts necessary to establish the . . . cause of action*," *Bartone*, 656 A.2d at 225 (emphasis added). We do not agree.

 We review *de novo* the district court's denial of the Diocese's Rule 50(b) motion. *See EEOC v. Ethan Allen, Inc.*, 44 F.3d 116, 119 (2d Cir.1994). In doing so, we "must view the evidence in the light most favorable to the party against which the motion was made . . . making all credibility assessments and drawing all inferences in favor of the non-movant." *Id.* (internal quotation marks and citations omitted).

Although the district court erred in instructing the jury that the "actual awareness" element of *Bartone* was not fully required to be met, we agree with its conclusion on the Rule 50(b) motion that the Diocese is nonetheless not entitled to judgment as a matter of law on the issue, but for different reasons.

 In our view, both the parties and the district court misconstrue what the first *Bartone* factor—"actual awareness . . . of the facts necessary to establish [Martinelli's] cause of action," *Bartone*, 656 A.2d at 225—requires with respect to the Diocese's knowledge. We do not think it means that for the Diocese to have fraudulently concealed Martinelli's cause of ac-

tion, it had to have been aware that Father Brett sexually assaulted Martinelli rather than another of Brett's students. Such specific knowledge is not necessary to establish Martinelli's cause of action.

The import of *Bartone*'s first element is that defendant's knowledge must be actual not imputed. Although the clause went on to state that the knowledge needed to be of the "facts necessary to establish plaintiff's cause of action," that language was beside the point that the *Bartone* court was making.

The Supreme Court of Connecticut's articulation of the first *Bartone* factor must be understood in light of the *Bartone* facts. The issue in *Bartone* was straightforward: whether one of the defendants, a building general contractor, was aware of defects in the work of its employees which it concealed from the plaintiffs, owners of a new home built by the contractor, in order to avoid liability to the plaintiffs. The identity of the plaintiffs as the victims of the contractor's negligence, if any, was obvious and therefore not an issue in the case. *Bartone* did not involve, as does the present case, a potential for harm to unknown persons allegedly exacerbated by the defendant's failure to disclose.

*Bartone* would be similar to the present case only if the defendant contractor there had actual knowledge of something like the delivery of dangerously defective building materials to one of its work sites, but did not know to which of several sites the defective materials had gone. If that had been the case, we are confident that the *Bartone* opinion would not have described that which the defendant needed to know to establish fraudulent concealment as the "facts necessary to establish plaintiff's cause of action." We seriously doubt that the Supreme Court of Connecticut would have thereby exempted the defendant from operation of the tolling statute simply because it did not know whose home had been built with the defective materials and, not knowing who the potential plaintiff

was, did not know all of the "facts necessary to establish" the claim.

■ We conclude that, in the proper case, the Connecticut Supreme Court would hold that to establish the first *Bartone* factor it is sufficient to show that the defendant had and concealed actual awareness of facts that created a *likely potential for harm,* especially if the defendant was a fiduciary for the likely victim.

This is, of course, just such a case. The claim on which the jury based its award to Martinelli is that, when the Diocese learned that Father Brett had sexually molested boys, at least one of them unidentified, it owed the boys within the scope of its fiduciary obligations, including Martinelli, a duty to investigate and to warn possible past and future victims of the harm. Its failure to do so prevented Martinelli from receiving the treatment he required, thereby exacerbating his injury.

A jury could reasonably find that in December 1964 the Diocese learned that Father Brett had sexually abused "T.F." in Bridgeport, and that Brett had "been involved" with another youth in Stamford. In January 1966, the Diocese learned about another minor, "M.F.," whom Father Brett had allegedly solicited; "M.F." did not tell his parents about Father Brett's conduct for some two years, and at the end of that period "M.F." required

hospitalization. Assuming, as the jury found, that the Diocese owed parishioners in Martinelli's circumstances a fiduciary duty, the jury could also conclude that the Diocese breached that duty by failing to investigate who the additional victims were, or by failing to warn or inform parishioners in Martinelli's circumstances of Brett's conduct so as to increase the likelihood that victims would seek counseling and treatment.

If the Diocese had a fiduciary duty toward Martinelli and knew that at least one other young person to whom it owed such a duty had been assaulted and that the Diocese's failure to disclose Brett's conduct or discover who the victim was would likely compound this victim's injury, a jury could conclude that the Diocese was actually aware of the "facts necessary" to establish Martinelli's cause of action sufficiently to satisfy the first *Bartone* factor. Just as a hit-and-run driver need not know the identity of an injured pedestrian to recognize that the pedestrian likely has a cause of action against the driver, the Diocese's knowledge of the actual identity of an assaulted child was not required for it to realize that there was likely to be an actionable claim, or for it to seek to conceal from such a potential plaintiff the facts underlying the claim.[7]

We therefore agree with the district court's conclusion that an absence of evi-

---

7. It is at this point, we think, that the dissent's analysis goes awry. The dissent describes a Diocese with "early storm warnings," dissent, *post* at 433, or "hints," *id.* at 433, that Father Brett may have molested an unknown boy, or knowledge of the *"potential* for injury." *Id.* at 435 (emphasis in original). The evidence suggests facts starkly to the contrary. A jury could conclude that the Diocese actually—not by imputation—*knew* that at least one unidentified boy had probably been sexually abused by Father Brett and that it deliberately failed to disclose that fact or to determine the identity of the victim or victims. Such a finding of actual awareness and failure to investigate or disclose would support a finding for the plaintiff on the first *Bartone* factor, whether or not possession of "early storm warnings" or "hints" or knowledge of "potential for injury" would suffice.

We question the dissent's reliance on *Bound Brook Associates v. City of Norwalk,* 198 Conn. 660, 504 A.2d 1047 (1986). *See* dissent, *post* at [433–35]. There the defendant had no knowledge of the facts underlying the plaintiffs' cause of action "[w]ithout [which defendant] could hardly have intended to conceal the rights the plaintiffs now claim to have." 198 Conn. at 668, 504 A.2d at 1052. Here, by contrast, a jury could conclude that the defendant had knowledge of the facts necessary to establish the plaintiff's cause of action, excepting only his identity which it failed to seek to determine, and that it carefully concealed those facts. *Bound Brook* hardly seems to us an "analog," "close[]" or otherwise, to the case at bar; that there was no duty to investigate or warn in *Bound Brook* says little about the duties owed by the defendant to the plaintiff here.

dence that the Diocese knew that Martinelli rather than another boy was the victim of abuse did not preclude a finding that the Diocese fraudulently concealed Martinelli's cause of action. *Bartone* does not require that the Diocese have possessed such knowledge and the Diocese was not therefore entitled to judgment as a matter of law on that basis.

On retrial, the court will be obliged to charge the jury on this issue. While we predict with confidence that, when similar issues are presented to the Connecticut Supreme Court, it will allow the first *Bartone* factor to be satisfied by evidence of the character adduced by the plaintiff in this case, we cannot safely predict precisely how the court will formulate the test. In view of this uncertainty, it would, we think, be prudent for the district judge when fashioning a charge to adhere as closely as possible to the facts on which Martinelli's claim depends, rather than attempting to anticipate the more generalized standard that the Connecticut court will ultimately adopt. We suggest in the margin[8] for the guidance of the district court an approach that we think would lead to a jury instruction that would come within the *Bartone* rule as it is likely to be interpreted when the Connecticut courts deal with facts similar to these.

### F. Plaintiff's Ignorance.

The district court instructed the jury that the Diocese carried the burden of proof not only with respect to the *Bartone* factors, but as to Martinelli's own ignorance of the existence of his cause of action under § 52–595 as well. The Diocese was required by the court to "disprove . . . by clear and convincing evidence . . . [t]hat [Martinelli] was not aware of the essential factual elements of his cause of action prior to July 27, 1990," three years prior to his institution of suit. We agree with the Diocese that this was error.

■ Although § 52–595 does not explicitly say so, it clearly implies that plaintiff's ignorance of the facts is a necessary element of tolling under that statute. A statute that tolls a limitations period because of the defendant's fraudulent concealment of a fact or facts obviously operates for the benefit of those—and we think *only* those—who are not aware of the facts that have been concealed. Moreover, because the statute provides that, after tolling, "the cause of action shall be deemed to accrue . . . at the time when the person entitled to sue thereon first discovers its existence," there plainly can be no effective tolling for a plaintiff who was aware of the existence of his or her cause of action from the time the claim originally accrued. We therefore conclude that the plaintiff must be ignorant of the facts that the defendant has sought to conceal for the statute of limitations to toll under § 52–595.

■ Because the Diocese owed a fiduciary duty to Martinelli and the principles of *Murphy* call for shifting some burdens

---

8. The court might instruct the jury that it must determine whether the Diocese had actual knowledge of the following: 1) Father Brett provided leadership and guidance to a group of minor male students at a school affiliated with the Diocese; 2) he sexually abused at least one of those boys whose identity was known to the Diocese and it was likely that he was sexually involved with or sexually abused another boy; 3) such sexual abuse of a minor could be injurious to the minor; 4) the extent or gravity of the injury could be reduced if the victim received treatment or help; 5) a minor in such circumstances is likely to conceal, suppress or repress the facts of such abuse and would therefore be less likely to receive beneficial treatment or help if the Diocese failed to disclose what it had learned of Father Brett's misconduct; and 6) the Diocese knew that, despite its knowledge of the first five facts, it had failed to disclose Father Brett's misconduct to other potential victims, including Martinelli, and their families. The instruction might continue: "If you find that the Diocese has proven by clear and convincing evidence that it did not have actual knowledge of one or more of those six facts, you must find for the Diocese on the issue of the Diocese's actual knowledge; otherwise you must find for the plaintiff on the issue."

of proof to a fiduciary defendant, the district court placed the burden of proof with respect to the issue of plaintiff's ignorance on the defendant. We do not think that the Connecticut cases so hold or justify the district court's having done so.

■ In general, the law places the burden of proof on the party that asserts a contention and seeks to benefit from it. *See, e.g., Katz v. Goodyear Tire and Rubber Co.*, 737 F.2d 238, 243 (2d Cir.1984) (burden of proving residency under New York borrowing statute placed on party seeking to take advantage of its terms). From time to time, however, for reasons of policy often involving fairness to the parties, the law shifts the burden. Thus, in cases not involving a fiduciary relationship, § 52–595 places the burden of proving both the plaintiff's ignorance and the defendant's fraudulent concealment on a plaintiff who seeks to assert and benefit from a finding of the defendant's fraudulent concealment. *See Bartone*, 656 A.2d at 224–25. For the policy reasons explored in *Murphy*, when a plaintiff seeks the tolling provided by the statute and the defendant owes a fiduciary duty to the plaintiff, the burden of proof on the issue of the propriety of the defendant's conduct is shifted to the defendant; it must prove its own fair dealing. The reasons that justify shifting the burden to the fiduciary defendant on that question do not apply to the issue of plaintiff's ignorance.

The *Murphy* burden-shifting relates to the fiduciary's fair dealing. *See Murphy*, 721 A.2d at 1183 ("the burden of proving fair dealing properly shifts to the fiduciary") (citations and internal quotation marks omitted). Fair dealing is also the issue addressed by *Bartone*'s three-factor test relating to the defendant's awareness, conduct and motivation. Several factors justify shifting the burden of proof on fair dealing, including the fiduciary's "superior knowledge, skill ... expertise" and "dominant" position which "afford[ ] him great opportunity for abuse," *id.;* the difficulty such a plaintiff may have gathering the information needed to establish unfair dealing; and the fact that the fiduciary relationship places the fiduciary under an obligation to reveal such information to the person to whom the fiduciary duty is owed for his or her benefit.

But nothing in the language or the reasoning of *Murphy* similarly calls for shifting the burden on the issue of plaintiff's ignorance. Here, by contrast with the *Bartone* factors, the defendant's "superior knowledge, skill ... expertise" and "dominant" position do not deter the plaintiff from establishing that he did not learn the facts necessary for his or her cause of action from some other source; with respect to the plaintiff's knowledge, defendant's knowledge and access are *inferior* to the plaintiff's; and the fiduciary defendant cannot be expected to know, and has no duty to learn, what the knowledge the plaintiff may have obtained from others. There is therefore no reason to shift the burden of proof to the fiduciary defendant.

■ Because the district court wrongly instructed the jury that to avoid tolling the statute of limitations the Diocese had to prove that Martinelli had knowledge of his cause of action, the jury deliberated on a critical issue under an erroneous legal standard. And because we cannot say that the jury would have reached the same conclusion if Martinelli had been required to bear the burden of establishing his ignorance of the facts underlying his cause of action, the error was not harmless. We therefore reverse the judgment and remand for a new trial on the issue of whether under the tolling statute Martinelli can demonstrate by a preponderance of the evidence that he was unaware of the existence of his cause of action until after July 27, 1990.

## II. Sufficiency of the Evidence

The Diocese also argued in its Rule 50(b) motion that there was insufficient evidence to support the jury's finding that there was a fiduciary relationship between

the Diocese and Martinelli. In asserting on appeal that the district court erred in denying the motion on this ground, the Diocese claims principally that Martinelli was merely one of 300,000 parishioners to whom it owed no particular duty. We agree with the district court.

This Circuit has not resolved whether in a diversity action the sufficiency of the evidence is a question governed by state or federal law. *See Willis v. Westin Hotel Co.*, 884 F.2d 1556, 1563 n. 5 (2d Cir.1989). We need not do so in this instance because there is no material difference between the two standards' application here.[9]

■■■■ Under Connecticut law, a fiduciary relationship is a relationship that is "characterized by a unique degree of trust and confidence between the parties, one of whom has superior knowledge, skill or expertise and is under a duty to represent the interests of the other." *Dunham*, 528 A.2d at 1133. We are unable to say that the evidence did not reasonably support the jury's finding of a fiduciary relationship between the Diocese and Martinelli.

■■■■ Relying primarily on cases from other states, the Diocese asserts that for a fiduciary relationship to have arisen, the Diocese would have had to have clearly undertaken to act as a fiduciary with respect to Martinelli and to have had individual contact with him; and that there was no evidence that it did so here. We are unpersuaded. The Connecticut Supreme Court has specifically "refused to define a fiduciary relationship in precise detail and in such a manner as to exclude new situations, choosing instead to leave the bars down for situations in which there is a justifiable trust confided on one side and a resulting superiority and influence on the other." *Alaimo v. Royer*, 188 Conn. 36,

41, 448 A.2d 207, 209 (1982) (internal quotation marks and citation omitted). We are disinclined to read the specific requirements that the Diocese offers into Connecticut law.

The Diocese argues forcefully that it was not and must not be held to have been in a fiduciary relationship with all of its parishioners. But that is not the issue before us and we express no view with respect to it. We agree with the district court that irrespective of the duties of the Diocese to its parishioners generally, the jury could reasonably have found that the Diocese's relationship with Martinelli, based on the particulars of his ties to Brett and the Diocese's knowledge and sponsorship of that relationship, was of a fiduciary nature:

- Martinelli attended Stamford Catholic High School, a diocesan school where he was taught by priests who were employed by the Diocese.

- Martinelli had, and the Diocese knew he had, a special and privileged relationship with Father Brett, another of the Diocese's priests although not a Diocesan employee, as a member of "Brett's Mavericks," the small group of boys interested in liturgical reform in the Catholic Church to whom Brett acted as a mentor and spiritual advisor.

- Martinelli, as the Diocese was of course aware, was taught in grade school catechism classes and thereafter to trust and respect the bishop of the diocese; he considered his bishop his caretaker and moral authority.

- Martinelli's parents allowed him to participate with Father Brett and others in church-sponsored and extracurricular activities because they trusted Brett inasmuch as he was a priest.

---

9. *Compare SEC v. Warde*, 151 F.3d 42, 46 (2d Cir.1998) ("We will overturn a jury's verdict in favor of a plaintiff if the evidence supporting the verdict, viewed in the light most favorable to the plaintiff, is insufficient to support a reasonable finding in plaintiff's favor."), *with Blanchette v. Barrett*, 229 Conn. 256, 266, 640 A.2d 74, 80 n. 8 (1994) ("In an appeal from a judgment rendered upon a jury verdict, we review the evidence in the case in the light most favorable to the prevailing party to determine if it reasonably supports the jury's verdict.") (citation omitted).

- Father Brett spent more time with this identifiable group of boys than with others. In addition to more formal contacts, the group and Father Brett went for dinners, ice cream, and on walks, and rode around in his car together. These contacts were well known in the school and Diocesan communities. Msgr. Cusack, the guidance counselor at the Diocesan high school that Martinelli attended, knew specifically about Father Brett's contacts with Martinelli and the other boys.

- The Diocese encouraged Father Brett to work with the youth of the church. His responsibility, shared with another priest, for conducting the activities of the Diocese's Catholic Youth Organization, which sponsored weekly social and educational activities for high school parishioners, was widely known.

- Father Brett, surely with the knowledge and approval of the Diocese, also escorted boys on church field trips, on one occasion taking Martinelli and another boy to Baltimore and Washington where the three stayed at a seminary.

- The Diocese was entrusted with reports from young victims that they had been abused by Father Brett, who had used his position to influence them and inflict injury. One victim, "T.F.," specifically informed the Diocese of his concerns for other students who had accompanied Father Brett on his trips.

- The Diocese also learned, after its representatives confronted Father Brett, that he had assaulted other boys in Stamford. "M.F.," a second victim who complained to the Diocese, was also a member of Brett's Mavericks.

We agree with the district court that there was thus sufficient evidence from which the jury could reasonably have found that there existed a special relationship of trust and confidence between Martinelli and not only Father Brett, but the Diocese. It is reasonable for the jury to conclude that Martinelli, through the particular activities in which he was involved, including those which the Diocese sponsored, had a particularly close relationship with the Diocese from which a fiduciary duty might arise. The Diocese, in turn, occupied a superior position of influence and authority over Martinelli. It was also reasonable for the jury to conclude, based on evidence as to the specific information that the Diocese received about Brett's misconduct, including the existence and location of other likely victims and the ease with which the Diocese might have determined precisely who the likely victims were, that the Diocese owed Martinelli, and youths with a similar relationship with the Diocese, a duty of care including a duty to investigate and warn or inform so as to prevent or alleviate harm to additional victims. We agree with the district court, therefore, that the jury's finding of a fiduciary relationship under Connecticut law was supported by the evidence.

### III. First Amendment Claim

 The Diocese argues to us, as it did in its Rule 50(b) motion to the district court, that the Free Exercise Clause of the First Amendment prohibits the court's finding of a fiduciary relationship between the Diocese and Martinelli because the finding was based on religious doctrine and practices. The Diocese draws our attention to evidence at trial concerning religious matters, including testimony that Martinelli was taught that the bishop is like a "shepherd" to his "flock" of parishioners, and testimony about the status and responsibilities of the bishop under Canon Law. The Diocese makes the related point on appeal that in sustaining the jury's finding of a fiduciary relationship in its ruling denying the Rule 50(b) motion, the district court unconstitutionally relied on its own interpretation of religious doctrine, thereby determining for the church the religious duties it owes to its parishioners.

These arguments are meritless. As our preceding discussion makes clear, the jury's finding of a fiduciary duty was supported by ample evidence apart from the

evidence of a religious nature singled out by the Diocese.

■ To the extent that the jury did consider religious teachings and tenets, moreover, it did so to determine not their validity but whether, as a matter of fact, Martinelli's following of the teachings and belief in the tenets gave rise to a fiduciary relationship between Martinelli and the Diocese. The First Amendment does not prevent courts from deciding secular civil disputes involving religious institutions when and for the reason that they require reference to religious matters. *See, e.g., Jones v. Wolf,* 443 U.S. 595, 603, 99 S.Ct. 3020, 61 L.Ed.2d 775 (1979) (court permitted to decide issue as to church property even though it required court to examine religious documents). Although "First Amendment values are plainly jeopardized when ... litigation is made to turn on the resolution by civil courts of controversies over religious doctrine and practice," *Presbyterian Church v. Hull Church,* 393 U.S. 440, 449, 89 S.Ct. 601, 21 L.Ed.2d 658 (1969), neither the district court nor we have made any decision for or against any religious doctrine or practice. The Diocese points to no disputed religious issue which the jury or the district judge in this case was asked to resolve.

■ *Amici* cite the teaching of the Supreme Court that under the Constitution, "[t]he law knows no heresy, and is committed to the support of no dogma, the establishment of no sect." *Watson v. Jones,* 80 U.S. (13 Wall.) 679, 728, 20 L.Ed. 666 (1871). That is now an American truism, but it is unrelated to this appeal. Where a person's beliefs are alleged to give rise to a special legal relationship between him and his church, we may be required to consider with other relevant evidence the nature of that person's beliefs in order properly to determine whether the asserted relationship in fact exists. In doing so, we judge nothing to be heresy, support no dogma, and acknowledge no beliefs or practices of any sect to be the law.

The obvious distinction between the proper use of religious principles as facts and an improper decision that religious principles are true or false bears a certain family resemblance to the more mundane rules of hearsay. Evidence of a statement made out of court may be inadmissible as hearsay to prove the truth of the facts asserted in it, but may be admissible for the non-hearsay purposes of proving that the statement was made or that other facts can be inferred ·from the making of the statement. *See* Fed.R.Evid. 801(c). Similarly, the proposition advanced by a particular religion that "a bishop is like a 'shepherd' to the 'flock' of parishioners" cannot be considered by a jury to assess its truth or validity or the extent of its divine approval or authority, but may be considered by the same jury to determine the character of the relationship between a parishioner and his or her bishop.

Finally on this score, we find no merit to the Diocese's claim that the judgment violated the First Amendment by determining the Diocese's obligations to its parishioners as a matter of church doctrine. Martinelli's claim was brought under Connecticut law, not church law; church law is not ours to assess or to enforce. Martinelli's claim neither relied upon nor sought to enforce the duties of the Diocese according to religious beliefs, nor did it require or involve a resolution of whether the Diocese's conduct was consistent with them. The jury's consideration of church doctrine here was both permissible under First Amendment principles and required by Connecticut law.

In *Watson v. Jones,* a decision involving a dispute over church property that is relied upon by *amici* and quoted above, the Supreme Court made an observation that applies fully, we think, to the tort case now before us:

> [T]he courts when so called on must perform their functions [in cases involving churches] as in other cases.
>
> Religious organizations come before us in the same attitude as other voluntary

associations for benevolent or charitable purposes, and their rights of property, or of contract [or, we would add, their liability arising from the commission of a tort], are equally under the protection of the law, and the actions of their members subject to its restraints.... [W]e enter upon [the appeal's] consideration with the satisfaction of knowing that the principles on which we are to decide so much of it as is proper for our decision, are those applicable alike to all of its class, and that our duty is the simple one of applying those principles to the facts before us.

80 U.S. at 714.

### IV. Missing Witness Charge

The Diocese's final argument is that it was reversible error for the district court to charge the jury that it could draw a negative inference from the Diocese's failure to produce Father Brett as a witness.

▮▮▮▮ We need not determine whether in a diversity case a missing witness charge is governed by federal or state law because here the two standards are similar,[10] and the charge, which we review only for abuse of discretion, *see United States v. Torres*, 845 F.2d 1165, 1170–71 (2d Cir. 1988); *State v. Lewis*, 245 Conn. 779, 813–14, 717 A.2d 1140, 1159 (1998), was plainly proper under both standards.

The Diocese's principal complaint is that Martinelli did not show that Father Brett was *available* to be produced at trial. The record shows, however, that Brett remained incardinated to the Bridgeport Diocese; Diocesan officials were in contact with him as late as in 1993, and after the date that Martinelli brought his claim; the Diocese knew Brett's address, telephone number, and place of employment; and a Ms. Warick, apparently acting on the Diocese's behalf, also had more recent contact with the priest. In light of evidence of this nature, we are unable to conclude that the district court's instruction was an abuse of discretion.

### CONCLUSION

For the foregoing reasons, we affirm the district court's order denying the Diocese's Rule 50(b) renewed motion for judgment as a matter of law. We also vacate the judgment and remand for a new trial on the issues of (1) whether Martinelli has met his burden of proof as to his own lack of knowledge of his cause of action and therefore can invoke the tolling statute; and (2) whether the Diocese has demonstrated by clear and convincing evidence that it lacked knowledge of the plaintiff's cause of action, so as to avoid application of the tolling statute on that basis. While a new trial is necessary on these two points, we leave it to the district court's discretion to determine the extent to which these issues may fairly be tried in isolation from other aspects of the case. If the district judge thinks it preferable, she may conduct a broader retrial on remand.

The parties shall bear their own costs on appeal.

MORAN, District Judge, dissenting:

While I agree with a great deal of the majority's thorough and thoughtful opin-

---

**10.** In this circuit, the charge "permits the jury to draw an adverse inference against a party failing to call a witness when the witness's testimony would be material and the witness is peculiarly within the control of that party." *United States v. Caccia*, 122 F.3d 136, 138 (2d Cir.1997). In determining whether a witness was available to be called by the party, the court considers "all the facts and circumstances bearing upon the witness's relation to the parties, rather than merely on physical presence or accessibility." *United States v. Torres*, 845 F.2d 1165, 1170 (2d Cir.1988) (internal quotation marks and citation omitted). In Connecticut, an adverse inference instruction may be given where a witness "is available; and ... could reasonably be expected, by his relationship to the party or the issues, to have peculiar or superior information material to the case that, if favorable, the party would produce." *State v. Lewis*, 245 Conn. 779, 813–14, 717 A.2d 1140, 1159 (1998) (citing *Secondino v. New Haven Gas Co.*, 147 Conn. 672, 165 A.2d 598 (1960)) (quotation and additional citations omitted).

ion, I must dissent. Even if we accept that the Diocese had a duty to inquire further into Brett's misconduct and thus charge the defendant with an awareness of Martinelli's cause of action based on earlier "storm warnings,"[1] the fact remains that the Diocese' knowledge of Martinelli's trauma is still imputed knowledge. *Bartone*, the last word from the Connecticut Supreme Court, is very clear on this point: imputed knowledge is insufficient to toll the statute of limitations.

> Under our case law, to prove fraudulent concealment, the plaintiffs were required to show: (1)[the] defendant's actual awareness, rather than imputed knowledge, of the facts necessary to establish the plaintiffs' cause of action; (2)[the] defendant's intentional concealment of these facts from the plaintiffs; and (3)[the] defendant's concealment of the facts for the purpose of obtaining delay on the plaintiffs' part in filing a complaint on their cause of action.

*Bartone v. Robert L. Day, Co.*, 232 Conn. 527, 533, 656 A.2d 221 (Conn.1995) (emphasis added) (citations omitted).

The majority contends that the actual knowledge requirement can be met here by showing that the Diocese knew of the essential facts giving rise to Martinelli's claim of "breach of duty to investigate and warn." In other words, the first *Bartone* prong is satisfied if the Diocese had actual knowledge that it failed to investigate hints that Father Brett abused at least one other parish boy. The majority speculates, at 40–41, that on different facts involving an unknown victim the *Bartone* court would not have stated the test to require defendant's knowledge of the "facts necessary to establish plaintiff's cause of action," and that this second clause "was beside the point that the *Bartone* court was making."

The hypothesis does not take into account that this formulation of the test was previously stated by the high court in 1986 in a case involving an alleged duty to investigate and warn unidentified victims. In *Bound Brook Associates v. City of Norwalk*, 198 Conn. 660, 504 A.2d 1047 (Conn. 1986), arguably the closest analog to the case at hand, subdivision residents sought damages from the City, its chief building inspector, and other city officials for latent damage to their homes. Part of the subdivision had been constructed on a swamp with a fluctuating water table and settlement problems resulted when the untreated wood pilings on which the homes were built began to decay. All parties agreed that absent a finding of fraudulent concealment, the suits would be time-barred. The Supreme Court set aside the judgment for the homeowners after finding insufficient evidence that the building inspectors intended to conceal information regarding potential piling defects with an intent to delay the plaintiffs' discovery of their cause of action. The Court consequently declined to decide whether the defendants had a duty to investigate and warn (although it is obvious that investigation and enforcement of standards was a core purpose of the municipal department) or whether an intentional failure to act in such circumstances would be sufficient to establish fraudulent concealment. *Bound Brook*, 198 Conn. at 669–70 & nn.12, 13, 504 A.2d 1047. It is instructive, however, that despite plaintiffs' argument that defendants owed a duty to investigate and warn other homeowners after the inspectors learned of the first three homes needing repiling, the Court did not reassign the burden of proof or reformulate the actual knowledge requirement to focus on defendants' knowledge of the red flags.

"Knowledge" is imputed where it is reasonable to charge a party with information it should know whether by agency, respondeat superior, or breach of a duty to investigate. In this last category, the defen-

---

1. *See Dodds v. Cigna Securities, Inc.*, 12 F.3d 346, 350 (1993) (2d Cir.1993) (noting that sufficient "storm warnings" of fraud will trigger a duty of inquiry and knowledge will be imputed to an investor who does not make such an inquiry), *cert. denied*, 511 U.S. 1019, 114 S.Ct. 1401, 128 L.Ed.2d 74 (1994).

dant can always be said to have actual knowledge of the "warning" facts that make imputing knowledge of the ultimate facts a reasonable thing to do. The majority's theory would effectively eliminate the actual knowledge requirement any time there is an allegation that the defendant had a duty to investigate. There is no indication that the Legislature or the Supreme Court of Connecticut would favor liberalizing the limitations period for such claims. On the contrary, by refusing to allow imputed knowledge to satisfy the first prong, the Connecticut Supreme Court has implicitly rejected the theory on which the majority relies. Furthermore, breach of a duty to disclose is foreseeably implicated by Conn. Gen.Stat. § 52–595, which by its terms involves concealment of actionable information. Breach of a duty to warn or investigate, on the other hand, is more tenuously connected to the purposes of the statute.[2]

Father Brett's conduct was reprehensible and, assuming Martinelli's account is accurate, I don't doubt that it has caused him significant pain. This is not a claim against Brett, however; nor is it a claim against the parish leadership. It is actually a rather remote claim against the regional diocese. The result here will mean that if an organization may owe a fiduciary duty to someone, anyone, it must investigate any possible source of harm and disclose the details to all potential plaintiffs. If it does not, the statute of limitations will offer no protection when the unknown claim ripens years later. Given that the source of the duty to investigate here is not the master-servant relationship with Brett but the Diocese' relationship with Martinelli, what new obligations does this holding impose on boys and girls clubs, and YMCAs, and other organizations who regularly shelter children at risk? Moreover, if awareness that someone might or would be harmed is the standard, then anyone injured in an auto accident who claims defective design can now argue that the manufacturer knew of the potential for injury, if not the victim, and the statute will be tolled. Back pains may materialize years after a collision.

We should not let this sad case disrupt the carefully balanced tolling framework established by the State of Connecticut. As the United States Supreme Court explained in *Johnson v. Railway Express Agency, Inc.*:

> Any period of limitation ... is understood fully only in the context of the various circumstances that suspend it from running against a particular cause of action. Although any statute of limitations is necessarily arbitrary, the length of the period allowed for instituting suit inevitably reflects a value judgment concerning the point at which the interests in favor of protecting valid claims are outweighed by the interests in prohibiting the prosecution of stale ones. In virtually all statutes of limitations the chronological length of the limitation period is interrelated with provisions regarding tolling, revival, and questions of application.

421 U.S. 454, 463–464, 95 S.Ct. 1716, 44 L.Ed.2d 295 (1975). See also *Spinozzi v. ITT Sheraton Corp.*, 174 F.3d 842, 848 (7th Cir.1999) (("[A]ccrual and tolling rules ... are reciprocals of the length of the period. A short limitations period can be offset by generous accrual and tolling rules, and a long limitations period offset by miserly ones")). The Connecticut legislature gave victims an extraordinary 17 year period after the age of majority in which to bring claims regarding sexual abuse. In doing so, it has rendered its "value judgment concerning the point at which the interests in favor of protecting valid claims are outweighed by the interests in prohibiting the prosecution of stale ones." *Johnson*, 421 U.S. at 463–464, 95 S.Ct. 1716. I do not

---

**2.** *See, e.g., Lippitt v. Ashley,* 89 Conn. 451, 94 A. 995, 1005 (Conn.1915) (no fraudulent concealment where directors of bank failed to discover treasurer's ongoing embezzlement). We can find no case from Connecticut (or any other jurisdiction) in which defendant's breach of a duty to investigate was sufficient to meet the actual knowledge requirement for fraudulent concealment.

share the majority's belief that the State Supreme Court would follow such an attenuated path to release Martinelli from his obligation to timely file his claim or to prove tolling by "clear, precise, and unequivocal evidence." *Bartone*, 656 A.2d at 224.

As a federal court sitting in diversity, we should be circumspect with our predictions, particularly if they expand the scope of liability. *See Guaranty Trust Co.of N.Y. v. York*, 326 U.S. 99, 105, 65 S.Ct. 1464, 89 L.Ed. 2079 (1945) ("In giving federal courts 'cognizance' of equity suits in cases of diversity jurisdiction, Congress never gave, nor did the federal courts every claim, the power to deny substantive rights created by State law or to create substantive rights denied by State law."); *Todd v. Societe Bic, S.A.*, 21 F.3d 1402, 1412 (7th Cir.) ("When given a choice between an interpretation of Illinois law which reasonably restricts liability, and one which greatly expands liability, we should choose the narrower and more reasonable path (at least until the Illinois Supreme Court tells us differently)."), *cert. denied*, 513 U.S. 947, 115 S.Ct. 359, 130 L.Ed.2d 312 (1994). If we guess wrong, and we sometimes do,[3] we "inevitably skew the decisions of [those] who rely on [our opinion] and inequitably affect the losing federal litigant who cannot appeal the decision to the state's supreme court; [we] may even mislead lower state courts that may be inclined to accept federal predictions as applicable precedent." Sloviter, *supra*, 78 Va.L.Rev. at 1681, *quoted in Lexington Ins. Co. v. Rugg & Knopp, Inc.*, 165 F.3d 1087, 1092–93 (7th Cir.1999).

Worse, we will have intruded on the exclusive prerogative of the State to control the development of its laws. *See Factors Etc., Inc. v. Pro Arts, Inc.*, 652 F.2d 278, 282 (2d Cir.1981) (noting that courts sitting in diversity should seek to minimize any "interruption of the orderly development and authoritative exposition of state law."); *Torres v. Goodyear Tire & Rubber Co., Inc.*, 857 F.2d 1293, 1296 (9th Cir.1988) ("We hesitate prematurely to extend the law of products liability in the absence of an indication from the Arizona courts or the Arizona legislature that such an extension would be desirable. We have limited discretion in a diversity case 'to adopt untested legal theories brought under the rubric of state law.'"). Given my belief that the majority has guessed wrong, I must respectfully dissent.

---

**3.** *See, e.g.*, Dolores K. Sloviter, *A Federal Judge Views Diversity Jurisdiction through the Lens of Federalism*, 78 Va.L.Rev. 1671, 1679–80 & nn.48–51 (1992) (collecting erroneous "Erie guesses" in the 3rd Circuit); *Poindexter v. Armstrong*, 934 F.Supp. 1052, 1056 (W.D.Ark.1994) (noting that 8th Circuit Court of Appeals was "apparently mistaken" in light of subsequent decision by Arkansas Supreme Court); *DeWeerth v. Baldinger (DeWeerth II)*, 38 F.3d 1266, 1272 (2d Cir.1994) (acknowledging that New York Court of Appeals subsequently applied a different standard on applicable statute of limitations from the one predicted by the Second Circuit, but refusing any post-judgment relief for the plaintiff because the doctrine of finality of judgments outweighed "any injustice DeWeerth believes she has suffered by litigating her case in the federal as opposed to the state forum."). In *DeWeerth II*, at least, the plaintiff had chosen the federal forum. Here, the Diocese never had the opportunity to secure a state court interpretation of Conn. Gen.Stat. § 52–595.